**SCHUBERT JONCKHEER & KOLBE LLP**
ROBERT SCHUBERT 62684
WILLEM F. JONCKHEER 178748
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161
wjonckheer@schubertlawfirm.com
rschubert@schubertlawfirm.com

*Counsel for Michael D. Marcus and*
*[Proposed] Liaison Counsel for the Class*

**BROWER PIVEN**
  A Professional Corporation
DAVID A.P. BROWER
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300
brower@browerpiven.com

*Counsel for Michael D. Marcus and*
*[Proposed] Lead Counsel for the Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACK PERLMUTTER, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>     vs.<br><br>INTUITIVE SURGICAL, INC., BENJAMIN GONG, ALEKS CUKIC, JEROME McNAMARA, MARK J. RUBASH, GARY GUTHART, MARSHALL MOHR, and LONNIE SMITH,<br><br>                              Defendants. | No. 5:10-cv-03451-LHK<br><br><u>CLASS ACTION</u><br><br>NOTICE OF MOTION AND MOTION BY MICHAEL D. MARCUS FOR APPOINTMENT OF LEAD PLAINTIFF AND APPROVAL OF SELECTION OF COUNSEL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>DATE:       December 9, 2010<br>TIME:        1:30 p.m.<br>CTRM:      4 |

**NOTICE OF MOTION AND MOTION**

TO:   ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD

PLEASE TAKE NOTICE that on December 9, 2010, at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 4 of the Honorable Lucy H. Koh, Michael D. Marcus ("Mr. Marcus" or "Movant") will and hereby does move this Court pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4(a)(3)(B), for an order: (1) appointing Mr. Marcus as Lead Plaintiff, and (2) approving Lead Plaintiff's selection of Brower Piven, A Professional Corporation ("Brower Piven") as Lead Counsel and Schubert Jonckheer & Kolbe LLP ("Schubert Firm") as Liaison Counsel for the Class.  This Motion is made on the grounds that Mr. Marcus is the "most adequate plaintiff."  In support of this Motion, Mr. Marcus submits herewith a Memorandum of Points and Authorities and the Declaration of Willem F. Jonckheer ("Jonckheer Decl.").

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   STATEMENT OF ISSUES TO BE DECIDED**

Presently pending in this Court is the above-captioned securities class action (the "Action") brought on behalf of all persons who purchased or otherwise acquired the publicly-traded securities of Intuitive Surgical, Inc. ("Intuitive" or the "Company") between February 1, 2008 and January 7, 2009, inclusive (the "Class Period").  The Action asserts claims pursuant to the Securities Exchange Act of 1934 ("Exchange Act") on behalf of purchasers of Intuitive's publicly-traded securities during the Class Period (the "Class").

This Action is brought pursuant to §§10(b) and 20(a) of the Exchange Act and Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  The Court is to appoint as lead plaintiff the member of the purported Class with the largest financial interest in the relief sought by the Class that otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.  15 U.S.C. §78u-4(a)(3)(B).  Here, Mr. Marcus should be appointed as Lead Plaintiff because he: (1) timely filed his motion for appointment as Lead Plaintiff; (2) has the largest financial interest in the outcome of this litigation of any person or group of

persons of which he is aware; and (3) will adequately represent the interests of the Class. *See* 15 U.S.C. §78u-4(a)(3)(B)(iii); *see also* Jonckheer Decl., Ex. A.

In addition, Mr. Marcus's selection of Brower Piven to serve as Lead Counsel and the Schubert Firm as Liaison Counsel should be approved because they possess extensive experience in the prosecution of securities class actions and will adequately represent the interests of all Class members.

**II.    SUMMARY OF THE ACTION[1]**

During the Class Period, defendants claimed that the "perceived advantages" of the da Vinci robot (a robotic surgical device that is Intuitive's key product) for prostate operations were causing increasing demand for a da Vinci operation over a traditional human-controlled operation. According to defendants, this increased demand for da Vinci robots would cause hospitals to buy even more of the Company's surgical products from which defendants would reap increasing annuity-like revenue because each robotic procedure required the hospital to use the Company's related products and services.

Prior to the Class Period, defendants had managed their earnings so as to miraculously beat analyst expectations 23 quarters in a row. In truth, a majority of the Company's potential clients had already purchased a da Vinci. Thus, defendants' aggressive growth (unbeknownst to shareholders) had come to an end prior to the beginning of the Class Period and defendants were well aware of this fact. by January 2008 (prior to the beginning of the Class Period), Intuitive's New System Sales departments were suffering catastrophic setbacks. Specifically, Intuitive's key clients, including the very hospitals which defendants had previously depended upon for sales, were cutting capital expenditures in the face of rising interest rates, tight credit markets, recession, rising deductibles, and inflationary fears. Despite this reality, defendants maintained a broad-based denial of the Company's true prospects. In fact, defendants claimed that Intuitive was essentially recession-proof

---

[1] This factual summary is taken from the allegations in the Class Action Complaint for Violation of Federal Securities Laws filed in this Action on August 6, 2010.

Notice of Motion and Motion of Michael D. Marcus for Appointment of Lead Plaintiff and Approval of Selection of Counsel; Memorandum of Point and Authorities in Support Thereof– 5:10-cv-03451-LHK                                                                                                                                    - 2 -

as the purchase of its machines was of the highest priority on its existing hospitals' capital expenditure budgets, and that the purchase of the da Vinci robots was considered necessary regardless of the cost. Defendants knew or consciously disregarded that since January 2008, 77% of hospitals had reduced capital spending, and 54% of hospitals had stopped future project spending altogether, which left most hospitals in no position to even contemplate the purchase of a da Vinci.

Defendants' own individual futures with the Company also would have been on dire footing if the truth about the Company was not kept hidden, especially as the Company shareholder meeting held in April 2008 was already in the pre-planning stages by January of that year, the commencement of the Class Period. Accordingly, keeping the truth from the shareholders was key if defendants were to justify the seven-figure bonuses and awards they had successfully extracted from the Company, which totaled in excess of $6.7 million, and if they were to continue to receive such exorbitant compensation going forward. Defendants also awarded themselves with severance agreements in the weeks prior to the beginning of the Class Period, so they would all have multi-million dollar golden parachutes should they be fired once anyone acquired the Company and unearthed defendants' misdeeds.

In July 2008, when Intuitive reported its financial results for Q2 2008, the defendants knew that the large scale medical sales they enjoyed in 2007 had come to an end. Nonetheless, defendants actually raised the Company's guidance for future quarters. In response to the Company's Q2 2008 report and projections, shares of the Company rose 18% to as high as $331. Defendants took advantage of this renewed artificial inflation of Intuitive's stock price and sold over $5 million of their holdings immediately thereafter.

Through Intuitive's Q2 2008 report, defendants succeeded in convincing the market of its unstoppable growth. At the same time, defendants promoted their favored analysts on the Company's own website, complete with the names of the analysts, the firm for whom they worked, and even the analysts' individual email addresses. In turn, these analysts boosted their price targets for the Company's stock. Analysts became even more bullish in response to defendants' continued false claims.

Bogus projections were but one of the means defendants used to inflate the stock price. To further support these projections and the appearance of growth, Intuitive stated in its 2007 Form 10-K, filed with the SEC on February 14, 2008, that the Company had recently entered into an agreement to purchase 7 acres of property adjacent to its headquarters in Sunnyvale, California, where they reportedly intended to build a new 154,000 square foot manufacturing and engineering building, in order to meet increased demand for the Company's products. In fact, demand for Intuitive's new systems was so poor that internally defendants had no plans to begin developing these facilities until 2010 at the earliest.

Most customers who could afford and who wanted Intuitive's da Vinci systems had bought them in previous quarters. The market for the systems had gotten to the point where demand was so lacking that defendants were forced to discount the price of the da Vincis and/or even sell deeply discounted "used" da Vincis, and even with these inducements, the defendants could not continue to post the record growth they projected that the Company had experienced prior to the Class Period. In 2008, demand from hospitals had dropped to the point where Intuitive was selling da Vincis to leasing companies, who in turn leased them to hospitals no longer interested in making such large-ticket purchases. Naturally, this "sales" practice remained undisclosed until 2009.

Despite the fact that the Company was facing the worst business environment in its history, defendants continued to project even more da Vinci system sales and increases in procedures involving the da Vincis in order to further inflate Intuitive's stock price. At investor meetings, executives sketched out the number of systems the market demanded. Unfortunately for shareholders, the projections were false. Privately, during a recession which was causing the share prices of companies similar to Intuitive to decline, defendants were attempting to pocket tens of millions of dollars through insider trading, together with bonuses and stock grants by inflating the Company's share value. Defendants claimed the basis for their outrageous bonuses and self-awarded grants was confidential and that providing the rationale for their internal grants to themselves would essentially give away their "trade secrets."

On January 7, 2009, the Company preannounced preliminary Q4 results that were below

1 expectations. Subsequently, on January 22, 2009, the Company released its actual fourth quarter 2008 sales numbers, revealing that Q4 2008 system sales were $114 million - down from $126 million in Q3 2008. In response, the Company's share price dropped to a close of $93.29 from its previous close of $96.01, a drop of nearly $250 per share, down from a 52-week high of $353.88. In addition, several analysts downgraded the stock to a "hold" from a "buy recommendation."

### III. ARGUMENT

#### A. Mr. Marcus Satisfies the PSLRA's Requirements and Should Be Appointed Lead Plaintiff

The PSLRA establishes the procedure for the appointment of a lead plaintiff in "each private action arising under [the Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. §78u-4(a)(1); *see also* 15 U.S.C. §78u-4(a)(3)(B)(i). First, the pendency of the action must be publicized in a widely circulated national business-oriented publication or wire service not later than 20 days after filing of the first complaint. 15 U.S.C. §78u-4(a)(3)(A)(i). This notice shall advise members of the class of: (1) the pendency of the action; (2) the claims asserted therein; (3) the purported class period; and (4) the right to move the court to be appointed as lead plaintiff within 60 days of publication of the notice. Here, notice was published on August 9, 2010 on *Marketwire* in connection with the filing of the first-filed action. *See* Jonckheer Decl., Ex. C.

Next, the PSLRA provides that the court shall adopt a presumption that the most adequate plaintiff is the person or group of persons that –

(aa) has either filed the complaint or made a motion in response to a notice . . . ;

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. §78u-4(a)(3)(B)(iii)(I); *see In re Cavanaugh*, 306 F.3d 726, 729-30 (9th Cir. 2002). Mr. Marcus meets each of these requirements and should therefore be appointed Lead Plaintiff.

### 1. Mr. Marcus's Motion Is Timely

Mr. Marcus has timely filed this Motion within 60 days of the August 9, 2010 notice publication, and has also duly signed and filed his certification evidencing, among other things, his willingness to serve as a representative party on behalf of the Class. *See* Jonckheer Decl., Ex. A. Accordingly, Mr. Marcus has satisfied the individual requirements of 15 U.S.C. §78u-4(a)(3)(B) and is entitled to have his application for appointment as Lead Plaintiff considered by the Court.

### 2. Mr. Marcus Possesses the Largest Financial Interest in the Relief Sought by the Class

According to 15 U.S.C. §78u-4(a)(3)(B)(iii), the Court shall appoint as lead plaintiff the movant or movants who have the largest financial interest in the relief sought by the action. *See Cavanaugh*, 306 F.3d at 732. As demonstrated herein, Mr. Marcus has actual Class Period losses of approximately $3,077,757.66. *See* Jonckheer Decl., Exs. A and B. To the best of his knowledge, there are no other applicants who have sought, or are seeking, appointment as lead plaintiff that have a larger financial interest. Therefore, Mr. Marcus satisfies the PSLRA's prerequisite of having "the largest financial interest in the relief sought by the class." 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(cc).

### 3. Mr. Marcus Meets Rule 23's Requirements

In addition to possessing a significant financial interest, a lead plaintiff must also "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15 U.S.C. §78u-4(a)(3)(B)(iii)(I)(cc). Rule 23(a) generally requires that the claims of representative parties be typical of the claims of the class and that the representatives will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23; *Cavanaugh*, 306 F.3d at 730. As detailed below, Mr. Marcus satisfies the typicality and adequacy requirements of Rule 23(a).

The test of typicality "'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation omitted). The threshold typicality and commonality requirements are not high; Rule 23(a) requires only that resolution of the common questions affect all, or a substantial number of, class members. *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 657 (C.D.

1  Cal. 2000). The adequacy requirement is met if no conflicts exist between the representative and
2  class interests and the representative's attorneys are qualified, experienced and generally able to
3  conduct the litigation. *Richardson v. TVIA, Inc.*, No. 06-06304, 2007 U.S. Dist. LEXIS 28406, at
4  *16 (N.D. Cal. Apr. 16, 2007) (citation omitted).

5  Here, Mr. Marcus meets the typicality and adequacy requirements because, like all other
6  members of the purported Class, he purchased Intuitive securities during the Class Period in reliance
7  upon defendants' false and misleading statements and suffered damages thereby. Because Mr.
8  Marcus's claims are premised on the same legal and remedial theories and are based on the same
9  types of alleged misrepresentations and omissions as the Class's claims, typicality is satisfied. *See*
10 *In re Surebeam Corp. Sec. Litig.*, No. 03-1721, 2003 U.S. Dist. LEXIS 25022 (S.D. Cal. Jan. 5,
11 2004). Additionally, Mr. Marcus is not subject to any unique defenses and there is no evidence of
12 any conflicts between Mr. Marcus and the other Class members. Therefore, Mr. Marcus satisfies the
13 *prima facie* showing of the typicality and adequacy requirements of Rule 23 for purposes of this
14 Motion.

15 **B.    This Court Should Approve Mr. Marcus's Selection of Counsel**

16 The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to
17 this Court's approval. *See* 15 U.S.C. §78u-4(a)(3)(B)(v). Courts should not disturb the lead
18 plaintiff's choice of counsel unless it is necessary to "protect the interests of the class." 15 U.S.C.
19 §78u-4(a)(3)(B)(iii)(II)(aa).

20 Here, Mr. Marcus has selected Brower Piven as Lead Counsel for the Class and the Schubert
21 Firm as Liaison Counsel for the Class. Brower Piven and the Schubert Firm have not only
22 prosecuted complex securities fraud actions, but have also successfully prosecuted many other types
23 of complex class actions as lead and/or class counsel. *See* Jonckheer Decl., Ex. D & E. Thus, the
24 Court may be assured that in the event this Motion is granted, the members of the Class will receive
25 the highest caliber of legal representation available from Brower Piven as Lead Counsel and the
26 Schubert Firm as Liaison Counsel. Because Mr. Marcus has selected and retained counsel
27 experienced in litigating securities fraud class actions with the resources to prosecute this Action to
28

Notice of Motion and Motion of Michael D. Marcus for Appointment of Lead Plaintiff and Approval
of Selection of Counsel; Memorandum of Point and Authorities in Support Thereof– 5:10-cv-03451-
LHK                                                                                                 - 7 -

1 the greatest recovery possible for the Class, his choice of Brower Piven as Lead Counsel and the Schubert Firm as Liaison Counsel should be approved.

**IV.     CONCLUSION**

For the foregoing reasons, Mr. Marcus respectfully requests that the Court: (1) appoint Mr. Marcus as Lead Plaintiff; (2) approve Mr. Marcus's selection of Lead Counsel and Liaison Counsel for the Class; and (3) grant such other and further relief as the Court may deem just and proper..

DATED:  October 8, 2010                                   **SCHUBERT JONCKHEER & KOLBE LLP**

ROBERT C. SCHUBERT
WILLEM F. JONCKHEER


_/s/_
WILLEM F. JONCKHEER

Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Telephone: (415) 788-4220
Facsimile: (415) 788-0161


*Counsel for Michael D. Marcus and*
*[Proposed] Liaison Counsel for the Class*

**BROWER PIVEN**
  A Professional Corporation
DAVID A.P. BROWER
488 Madison Avenue
Eighth Floor
New York, New York 10022
Telephone: (212) 501-9000
Facsimile:  (212) 501-0300

*Counsel for Michael D. Marcus and*
*[Proposed] Lead Counsel for the Class*

Notice of Motion and Motion of Michael D. Marcus for Appointment of Lead Plaintiff and Approval of Selection of Counsel; Memorandum of Point and Authorities in Support Thereof– 5:10-cv-03451-LHK                                                                                                                                                   - 8 -