1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| JACK PERLMUTTER, individually and on behalf of all others similarly situated | ) ) | Case No.: 10-CV-03451-LHK |
| Plaintiffs, | ) ) ) ) | ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION FOR APPOINTMENT AS |
| v. | ) ) | LEAD PLAINTIFF AND APPROVAL OF ITS SELECTION OF LEAD |
| INTUITIVE SURGICAL, INC., BENJAMIN GONG, ALEKS CUKIC, JEROME McNAMARA, MARK J. RUBASH, GARY GUTHART, MARSHALL MOHR, and LONNIE SMITH, | ) ) ) ) ) ) | COUNSEL, DENYING MICHAEL MARCUS' MOTION, AND DENYING JACK PERLMUTTER'S MOTION |
| Defendants. | ) ) ) | |

On August 6, 2010, Jack Perlmutter filed a private securities class action complaint against Defendants Intuitive Surgical, Inc., Benjamin Gong, Aleks Cukic, Jerome McNamara, Mark J. Rubash, Gary Guthart, Marshall Mohr, and Lonnie Smith (collectively "Defendants"). Dkt. No. 1 ("Compl."). After Perlmutter published the pendency of this action as required by federal law, Perlmutter and two other parties, Michael Marcus and the Police Retirement System of St. Louis ("St. Louis PRS"), moved the Court for appointment as lead plaintiff and for approval of lead counsel. After considering the parties' submissions, the relevant legal authorities, and oral argument, the Court hereby GRANTS St. Louis PRS's motion and DENIES Marcus' and Perlmutter's motions.

///

1

# I.  BACKGROUND

Defendant Intuitive Surgical, Inc. is a leading company in the field of robotic-assisted minimally invasive surgery.[1]  Compl. ¶ 17.  It provides customers throughout the world with technological and procedural innovations in the fields of cardiac, urologic, gynecologic, pediatric and general surgical disciplines.  *Id.*  According to Perlmutter, Intuitive's key product is a robotic surgical system called the da Vinci.  *Id.* ¶ 2.  The da Vinci surgical system controls surgical instruments, including endoscopes, scissors, scalpels, and forceps, during a range of surgical procedures.  Dkt. No. 12, at 2.  Depending on the model, a da Vinci system initially costs a hospital between $1 million and $2.25 million.  Compl. ¶ 35.  Beyond the purchase price, hospitals pay an additional $140,000 per year to maintain the system and between $1,500 and $2,000 per surgery for replacement parts.  *Id.* ¶ 35.  Apparently, for performing prostate operations, the da Vinci robot presents certain advantages over traditional human-controlled techniques.  *See id.* ¶ 3.

In his complaint, Perlmutter claims that Defendants utilized a series of false and misleading statements and omissions of material fact regarding the then-existing and potential market for the da Vinci robot in order to inflate and falsify Intuitive's true prospects and financial results.  *Id.* ¶ 2.  Perlmutter alleges that as a result of these statements and omissions, Intuitive's share price exceeded $353, and Defendants reaped in excess of $53 million in undeserved gains.  *Id.*  When Defendants allegedly disclosed Intuitive's true prospects, Intuitive's share price dropped to $93.29.  *Id.* ¶ 12.

Perlmutter claims to have purchased Intuitive stock during the period in which Defendants' statements artificially inflated its price.  *Id.* ¶ 16.  According to Perlmutter, this period (the "Class Period") began on February 1, 2008 and ended on January 7, 2009.  *Id.* ¶ 1.  Based on his allegations, Perlmutter brings two causes of action against Defendants on behalf of himself and all others, besides Defendants, who purchased or acquired Intuitive stock during the Class Period.  *Id.*

---

[1] The other Defendants were employed at Intuitive during the relevant period: Gong was the Vice President of Finance; Cukic was the Vice President of Business Development and Strategic Planning; McNamara was the Executive Vice President of Worldwide Sales; Rubash was a Director and the designated Audit Committee Financial Expert; Guthart was the President and a Director; Mohr was the Chief Financial Officer; and Smith was the Chief Executive Officer and Chairman of the Board.

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

*United States District Court*
For the Northern District of California

1   First, Perlmutter claims that all Defendants violated § 10(b) of the Securities and Exchange Act of

2   1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated pursuant to § 10(b)

3   of the Exchange Act.  *Id.* ¶¶ 96-100.   Second, Perlmutter claims that Defendants McNamara,

4   Guthart, and Smith violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  *Id.* ¶¶ 101-103.  On

5   behalf of himself and the putative class, Perlmutter seeks damages and costs.

6          On October 8, 2010, Perlmutter, Marcus, and the St. Louis PRS moved to be appointed as

7   lead plaintiff in this action and for approval of their choice of lead counsel.  Dkt. Nos. 12 ("St.

8   Louis Mot."), 14 ("Perlmutter Mot."), 16 ("Marcus Mot.").  Each opposes the appointment of the

9   others.

10                              **II.  LEGAL STANDARD**

11         The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, governs the

12   selection of a lead plaintiff in private securities class actions.  In the PSLRA's own words, this

13   plaintiff is to be the "most capable of adequately representing the interests of class members."  15

14   U.S.C. § 78u-4(a)(3)(B)(i).  Under the PSLRA, a three-step process determines the lead plaintiff.

15   *In re Cavanaugh*, 306 F.3d 726, 729 (9th Cir. 2002).  First, the first plaintiff to file an action

16   governed by the PSLRA must publicize the pendency of the action, the claims made, and the

17   purported class period "in a widely circulated national business-oriented publication or wire

18   service."  15 U.S.C. § 78u-4(a)(3)(A)(i)(I).[2]  This notice must also alert the public that "any

19   member of the purported class may move the court to serve as lead plaintiff."  15 U.S.C. § 78u-

20   4(a)(3)(A)(i)(II).[3]

21         Second, the court must select the presumptive lead plaintiff.  *See In re Cavanaugh*, 306

22   F.3d at 729-30 (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)).  In order to determine the presumptive

23   lead plaintiff, "the district court must compare the financial stakes of the various plaintiffs and

24   determine which one has the most to gain from the lawsuit."  *Id.* at 730 (footnote omitted).  Once

25   the district court identifies the plaintiff with the most to gain, the district court must determine

26

27   [2] This publication is to be made "[n]o later than 20 days after the date on which the complaint is filed."  15 U.S.C. § 78u-4(a)(3)(A)(i).

28   [3] Those who wish to move the court for appointment as lead plaintiff must do so "not later than 60 days after the date on which the notice is published."  15 U.S.C. § 78u-4(a)(3)(A)(i)(II).

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

*United States District Court*
For the Northern District of California

1   whether that plaintiff, based on the information he provides, "satisfies the requirements of Rule

2   23(a), in particular those of 'typicality' and 'adequacy.'"  *Id.*  If he does, that plaintiff becomes the

3   presumptive lead plaintiff.  *Id.*  If not, the court selects the plaintiff with the next-largest financial

4   stake and determines whether that plaintiff satisfies the requirements of Rule 23.  *Id.*  The court

5   repeats this process until it selects a presumptive lead plaintiff.  *Id.*

6          Third, those plaintiffs not selected as the presumptive lead plaintiff may "rebut the

7   presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy

8   requirements."  *Id.* (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)).  This is done by showing that the

9   presumptive lead plaintiff either "will not fairly and adequately protect the interests of the class" or

10  "is subject to unique defenses that render such plaintiff incapable of adequately representing the

11  class."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)(aa)-(bb).  If the court determines that the presumptive

12  lead plaintiff does not meet the typicality or adequacy requirement, then it must return to step two,

13  select a new presumptive lead plaintiff, and again allow the other plaintiffs to rebut the new

14  presumptive lead plaintiff's showing.  *In re Cavanaugh*, 306 F.3d at 731.  The court repeats this

15  process "until all challenges have been exhausted."  *Id.* (citation and footnote omitted).

16         Under the PLSRA, the lead plaintiff is given the right, subject to court approval, to "select

17  and retain counsel to represent the class."  15 U.S.C. § 78u-4(a)(3)(B)(v).  "[T]he district court

18  should not reject a lead plaintiff's proposed counsel merely because it would have chosen

19  differently."  *Cohen v. U.S. Dist. Court*, 586 F.3d 703, 711 (9th Cir. 2009) (citation omitted).  "[I]f

20  the lead plaintiff has made a reasonable choice of counsel, the district court should generally defer

21  to that choice."  *Id.* at 712 (citations omitted).

22                            **III.  ANALYSIS**

23         In conformity with the procedure established by the PSLRA and the Ninth Circuit in *In re*

24  *Cavanaugh*, the Court will decide whether Perlmutter, Marcus, or the St. Louis PRS should serve

25  as the lead plaintiff in the instant action.

26         **A.  Notice to Class Members**

27         The Court will first review whether the three potential plaintiffs properly complied with the

28  deadlines set forth in the PLSRA for noticing a securities class action and moving the court for

4

United States District Court
For the Northern District of California

appointment as lead plaintiff.  On August 9, 2010, three days after filing his complaint, Perlmutter published a notice of his action on *Business Wire*, which Perlmutter represents is a widely circulated and national business-oriented wire service.  Perlmutter Mot. 5; *see also* Dkt. No. 15 ("Braun Decl."), Ex. A.  According to Perlmutter, his notice met all of the requirements set forth in 15 U.S.C. § 78u-4(a)(3)(A)(i).  *Id.*  None of the moving parties dispute this.

All three of the movants filed their motions for appointment as lead plaintiff on October 8, 2010, exactly 60 days after Perlmutter published his notice.  Thus, all three motions for appointment as lead plaintiff were timely filed.

### B. Presumptive Lead Plaintiff

Because Perlmutter, Marcus, and the St. Louis PRS all timely filed their motions for appointment as lead plaintiff, the Court will consider each of them as candidates for the position of presumptive lead plaintiff.

#### 1. Largest Financial Interest

As required by the PSLRA, the Court will compare the relative financial stakes of the three Plaintiffs in order to identify the Plaintiff with the largest financial interest in the litigation.

Based upon the representations of the Plaintiffs, Marcus possesses the largest financial interest in the case.  He claims that his actual Class Period losses amount to approximately $3,077,757.66.[4]  In contrast, the St. Louis PRS claims a financial loss of either $477,070.85 or $463,563.54, depending on the method of calculation,[5] and Perlmutter claims a financial loss of $10,444.83.[6]

---

[4] Marcus' Intuitive stock holdings and transactions are numerous.  According to Marcus, he purchased 28,500 shares of Intuitive stock prior to the Class Period at an average price per share of $226.03182 for a total cost of $6,441,906.87.  Dkt. No. 17 ("Jonckheer Decl."), Ex. B.  Marcus claims that during the course of the Class Period and soon after the Class Period ended, he bought or sold Intuitive stock over one-hundred times.  *Id.*  Marcus claims that in sum, his actual Class Period losses equal approximately $3,077,757.66.  Marcus Mot. 6.
[5] The St. Louis PRS purchased a total of 7,900 shares during the Class Period at a total cost of $1,556,280.59.  Dkt. No. 13 ("Berg Decl."), Ex. C.  The St. Louis PRS claims that it eventually sold all of these shares for a total loss of either $477,070.85 or $463,563.54.  *Id.*  The larger loss number, $477,070.85, is based on the use of the traditional first in, first out (FIFO) accounting method.  The smaller loss number, $463,563.54, is based on the use of the last in, first out (LIFO) accounting method.  *Id.*
[6] Perlmutter represents that on April 11, 2008 he purchased 45 shares of Intuitive stock at $332.73 per share for a total purchase amount of $14,972.85.  Braun Decl., Ex. C.  According to

5

United States District Court

For the Northern District of California

1    Both the St. Louis PRS and Perlmutter, however, dispute Marcus' calculation of his loss.

2    They each argue that more well-accepted methods of calculating financial interest show that they,

3    not Marcus, have the largest financial interest in this litigation.  All of the parties agree that neither

4    the PSLRA nor the Ninth Circuit specifies precisely how to calculate which plaintiff has the largest

5    financial interest.  *See* Dkt. No. 21 ("St. Louis Opp'n"), at 5; Dkt. No. 23 ("Perlmutter Opp'n"), at 4;

6    Dkt. No. 29 ("Marcus Reply"), at 4.  The only real guidance offered by the Ninth Circuit in *In re*

7    *Cavanaugh* is that "the court may select accounting methods that are both rational and consistently

8    applied" in order to "compare the financial stakes of the various plaintiffs and determine which one

9    has the most to gain from the lawsuit." 306 F.3d at 730 & n.4.  As a result of the inexact nature of

10   the inquiry, district courts have used different methods to calculate financial interest.  These

11   various methods fall primarily into two categories.  Methods in the first category equate financial

12   interest with actual economic losses suffered.  *See Richardson v. TVIA, Inc.*, 2007 U.S. Dist.

13   LEXIS 28406, at *11-15 (N.D. Cal. Apr. 16, 2007) (looking primarily to the movants' approximate

14   losses suffered in identifying the plaintiff with the largest financial interest).  In contrast, a second

15   category of methods equates largest financial interest with potential recovery.  *See Eichenholtz v.*

16   *Verifone Holdings, Inc.*, No. C 07-06140 MHP, 2008 U.S. Dist. LEXIS 64633, at *12 (N.D. Cal.

17   Aug. 22, 2008) ("[T]he court finds no reason to include losses in its calculations that would later be

18   considered uncompensable.").

19   In some ways, the distinction between these two categories is an artificial one.  Inasmuch as

20   both a plaintiff's actual losses and a plaintiff's potential recovery converge, methods from both

21   categories should yield the same result.[7]  In light of recent Supreme Court and Ninth Circuit

22   precedent, however, there is reason to believe that the actual economic losses an investor may

23

24   Perlmutter's calculations, those same shares currently have an estimated value of $4,528.02.  *Id.*
     Therefore, Perlmutter's claimed financial loss is $10,444.83.  *Id.*

25   [7] Generally, "[i]n securities fraud cases damages per share are calculated as the artificial inflation
     when the shares were purchased minus the artificial inflation when the shares were sold." *In re*

26   *BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006) (quoting Michael Barclay and
     Frank C. Torchio, *A Comparison of Trading Models Used for Calculating Aggregate Damages in*

27   *Securities Litigation,* 64 Law & Contemp. Prob. 105, 106 (2001)) (quotation marks omitted).
     Although this is the general method of calculation, damages are capped by statute.  *See* 15 U.S.C.

28   § 78u-4(e).

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

1  suffer as a result of trading in a particular stock differ from the damages that that same investor

2  may be able to recover in a lawsuit based on his investments in that same stock.

3      The Supreme Court pointed out the difference between economic losses and recoverable

4  damages in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005).

5  In *Dura*, the Supreme Court considered the Ninth Circuit's holding that a plaintiff can plead loss

6  causation—a required element of a securities fraud claim—and overcome a motion to dismiss by

7  alleging that the price the plaintiff paid for the security was inflated because of misrepresentation.

8  *Id.* at 338.  The Supreme Court reversed and held that in cases involving "fraud-on-the-market"

9  allegations, a plaintiff must do more than claim that he purchased the stock at an inflated price in

10 order to properly state a claim for securities fraud.  *Id.* at 342.  In so holding, the Supreme Court

11 made it clear that a purchaser of stock at fraudulently inflated prices may suffer economic losses

12 that are not caused by a defendant's misrepresentations.  The Court observed that the lower price at

13 which purchasers of inflated stock resell their stock "may reflect, not the earlier misrepresentation,

14 but changed economic circumstances, changed investor expectations, new industry-specific or

15 firm-specific facts, conditions, or other events, which taken separately or together account for some

16 or all of that lower price."  *Id.* at 342-43.  According to the Court, securities laws are not meant to

17 "provide investors with broad insurance against market losses, but to protect them against those

18 economic losses that misrepresentations actually cause."  *Id.* at 345.  Although the Court did not

19 formulate any bright line rule for identifying damages caused by misrepresentation, the Court did

20 observe that if a purchaser of fraudulently inflated stock sells his "shares quickly before the

21 relevant truth begins to leak out, the misrepresentation will not have led to any loss."  *Id.* at 342.

22     District courts considering motions for appointment as lead plaintiff reacted differently to

23 the Supreme Court's holding in *Dura*.  In determining the financial interests of potential lead

24 plaintiffs, some district courts decided, in light of *Dura*, not to consider losses resulting from stock

25 trades that occurred prior to any disclosure of the defendant's fraud.  *See e.g.*, *In re Comverse*

26 *Tech., Inc. Sec. Litig.*, No. 06-CV-1825, 2007 U.S. Dist. LEXIS 14878, at *13-14 (E.D.N.Y. Mar.

27 2, 2007) (citing *Kops v. NVE Corp.*, 2006 U.S. Dist. LEXIS 49713 (D. Minn. July 17, 2006)); *see*

28 *also Ruland v. Infosonics Corp.*, 2006 U.S. Dist. LEXIS 79144, at *11-17 (S.D. Cal. Oct. 23,

7

2006).  Other courts, however, did not find *Dura* applicable to selecting a lead plaintiff.  Under their reasoning, the Supreme Court's holding in *Dura* simply recognized that "numerous factors may affect the price of a security" but "did not suggest that a court should guess about the effect of these as-yet-unknown factors in selecting a lead plaintiff."  *In re Watchguard Secs. Litig.*, 2005 U.S. Dist. LEXIS 40923, at *14-16 & n.6 (W.D. Wash. July 13, 2005) (citing *Dura*, 544 U.S. at 1631).

The court's position in *In re Watchguard* has merit.  Although the Supreme Court in *Dura* did distinguish between general investment losses and damages resulting from fraud, the Supreme Court's holding in *Dura* did not outline a clear method for distinguishing between the two.  In general, calculating damages in a securities fraud case is a highly technical task that usually involves a battle of experts.  *See Lan v. Ludrof*, 2008 U.S. Dist. LEXIS 22574, *42 (W.D. Pa. Mar. 21, 2008) ("If this case were to proceed to trial, Plaintiffs' ability to establish damages would depend on a battle of the experts."); *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 459 (S.D.N.Y. 2004) ("Calculation of damages is a 'complicated and uncertain process, typically involving conflicting expert opinion' about the difference between the purchase price and the stock's 'true' value absent the alleged fraud.") (quotation omitted).  District courts must select lead plaintiffs at a very early stage of litigation, before fact discovery and often long before the plaintiff's theory of the case is fully developed.  Thus, it is reasonable for courts to prefer to choose a lead plaintiff based on total losses—a rough estimate for a plaintiff's maximum recoverable damages—rather than attempting to estimate a plaintiff's recoverable losses.

Despite the legitimacy of this concern, recent Ninth Circuit authority favors considering loss causation on a motion for appointment as lead plaintiff.  These cases make it less likely that plaintiffs can recover losses incurred prior to the disclosure of a defendant's fraudulent conduct and thus provide greater justification for excluding those losses in any calculation of a potential lead plaintiff's financial interest in the litigation.  In *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008), the Ninth Circuit applied *Dura* and held that a plaintiff properly pleads loss causation by alleging that the market learned of and reacted to the allegedly fraudulent practices and by alleging that this reaction caused the plaintiff's loss.  *Id.*  The Ninth

8

1    Circuit recently extended this loss causation standard beyond the motion to dismiss context and

2    applied it in reviewing a motion for summary judgment.  In *In re Oracle Corp. Sec. Litig.*, 627 F.3d

3    376 (9th Cir. 2010), the Ninth Circuit affirmed a district court's granting of a defendants' motion

4    for summary judgment in a securities class action lawsuit.  In holding that the plaintiffs had failed

5    to create a triable dispute as to loss causation, the court stated that "[l]oss causation is established if

6    the market learns of a defendant's fraudulent act or practice, the market reacts to the fraudulent act

7    or practice, and a plaintiff suffers a loss as a result of the market's reaction."  *Id.* at 392 (citing

8    *Metzler Inv. GMBH*, 540 F.3d at 1063).  Even if these cases do not explicitly preclude plaintiffs

9    from recovering losses suffered prior to the disclosure of a defendant's fraud, they do outline a

10   concept of loss causation that favors losses occurring after a defendant makes corrective

11   disclosures.  In other words, it would seem that losses which occur prior to corrective disclosures

12   are not caused by a defendant's misrepresentations and are, therefore, not recoverable.

13        This difference in actual losses and recoverable damages makes the distinction between the

14   two categories of methods for calculating financial interest significant.  At least one district court

15   recognized this difference long before *Dura* and its progeny and expressed its preference for

16   methods that calculate financial interest in terms of potential damages.  *See In re McKesson*

17   *HBOC, Inc. Sec. Litig.*, 97 F. Supp. 2d 993, 997 (N.D. Cal. 1999).  That court reasoned that

18   "[o]ne's 'interest' in a litigation is rather directly tied to what one might recover."  *Id.*  The language

19   of *In re Cavanaugh* also favors using a method that focuses on calculating potential damages.  In

20   that case, the Ninth Circuit stated that district courts should "compare the financial stakes of the

21   various plaintiffs and determine which one has the most to gain from the lawsuit."  306 F.3d at 730

22   & n.4.  What a plaintiff has to gain from a lawsuit is much more directly tied to what a plaintiff can

23   recover from that lawsuit than what a plaintiff may have lost trading in the stock that is the subject

24   of that lawsuit.

25        Because *Dura* and its progeny create a potential distinction between actual losses and

26   recoverable damages and because a plaintiff's financial interest in the case is more strongly tied to

27

28

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

the latter, the Court will first compare each movant's potential recovery. [8]   In doing so, the court will utilize methods that apply the loss causation standard outlined above.   Nevertheless, because there is no controlling authority that requires this Court to equate financial interest with potential recovery, the Court will also consider the actual losses suffered by the movants.

### i.  Recoverable Damages

Courts that equate largest financial interest with potential recovery generally place the greatest weight on the number of net shares purchased during the class period.   Where they diverge, however, is on how to account for losses sustained during the class period.   Some courts determine the number of net shares purchased during the class period and then supplement this calculation with losses suffered as a result of selling shares during the class period.   *See e.g.*, *In re Silicon Storage Tech., Inc.*, 2005 U.S. Dist. LEXIS 45246, at *21-22 (N.D. Cal. May 3, 2005); *In re Critical Path Inc. Sec. Litig.*, 156 F. Supp. 2d 1102, 1107-08 (N.D. Cal. 2001).   They do so because they perceive that losses resulting from in and out trades made during the class period may be recoverable.   *In re Critical Path*, 156 F. Supp. 2d at 1108   Other courts, utilizing what they describe as the retained shares method, look only to the number of shares purchased during the class period that are retained at the end of the class period.   *See e.g.*, *Eichenholtz*, 2008 U.S. Dist. LEXIS 64633, at *10-14.   They do not take account of losses resulting from stock purchased and sold before the disclosure of the alleged misstatements or omissions.   *Id.*   The court in *Eichenholtz* disregarded those losses because, in the court's estimation, such losses likely would not ultimately be recoverable under the Supreme Court's holding in *Dura*.   *See id.*; *see also Ruland*, 2006 U.S. Dist. LEXIS 79144, at *11-17 (ignoring in and out gains in light of *Dura*).   As shown by the discussion of *Dura* and its progeny above, looking exclusively to the number of shares purchased

---

[8] The Court notes that Marcus objects to the Court determining at this stage how much of each movant's financial interest would amount to legally recoverable losses.  Marcus Reply 3.  The Court agrees that its calculations here are not a final decision on loss calculations or loss causation. *See In re McKesson*, 97 F. Supp. 2d at 996 ("[T]his discussion is limited to the resolution of the lead plaintiff motions, not to ultimate questions of liability or damages.").  It also agrees that "[t]he determination of damages . . . is a complicated and uncertain process, typically involving conflicting expert opinions."  *Maley v. Del Global Technologies Corp.*, 186 F. Supp. 2d 358, 365 (S.D.N.Y. 2002).  Nevertheless, the Court finds that because one's financial interest in the litigation is necessarily tied to what one can recover in damages from the litigation, some estimation as to what losses will ultimately be recoverable is appropriate.

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

1    during the class period that are also retained at the end of the class period is likely the most

2    accurate reflection of a plaintiff's potential damages.

3        Once a court identifies these retained shares, the court in *Eichenholtz* suggests calculating

4    damages by subtracting the purchase price for these retained shares from either (1) the average of

5    the daily closing price of the stock during the 90 day period beginning at the end of the class period

6    (if the share was not sold during the 90 day period) or (2) the higher of the actual sale price or an

7    average of the daily closing price from the end of the class period to the date of sale (if a share was

8    sold within the 90 day period). *Id.* at *14.[9]

9        The court in *Eichenholtz* also described two methods for determining the purchase price for

10   a plaintiff's retained shares.  "Under the first method, the purchase price of the retained shares is

11   calculated according to the shares purchased most recently, but within the class period."  *Id.* at *12-

12   13.  "Under the second method, the purchase price of the retained shares is calculated according to

13   the shares purchased at the beginning of the class period."  *Id.* at *13.  The court in *Eichenholtz*

14   chose the first method because it "maximize[d] the potential losses suffered by the plaintiffs" in its

15   case.  *Id.*  According to the court, "when the greatest financial interest is used to determine the lead

16   plaintiff, the court finds it appropriate to use the method of calculation that maximizes potential

17   damages."  *Id.*

18       Using the retained shares methodology, St. Louis PRS lost $879,134.01, Perlmutter lost

19   $10,444.83, and Marcus sustained no losses because, according to St. Louis PRS, he did not

20   possess any shares at the close of the Class Period that he purchased during the Class Period.  St.

21   Louis Opp'n 8.  Thus, the retained shares method clearly favors finding that St. Louis PRS has the

22   largest financial interest in the litigation.

23

24   _____

[9] This method is slightly different from the statutory method used to determine a plaintiff's
25   maximum potential recovery.  Under that method, a court subtracts the original purchase price for
     purchased shares from either (1) the average of the daily closing price of the security during the
26   period beginning immediately after dissemination of information correcting the misstatement or
     omission and ending on the date on which the plaintiff sells the security or (2) the average of the
27   daily closing price of the security during the 90 day period beginning on the date on which the
     information correcting the misstatement or omission that is the basis for the action is disseminated
28   to the market.  *See* 15 U.S.C. § 78u-4(e).  Because St. Louis PRS calculated its potential damages
     using the method outlined in *Eichenholtz*, the Court will use that method here.

11

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

| | Movants | | |
|---|---|---|---|
| | **St. Louis PRS** | **Perlmutter** | **Marcus** |
| Losses (Retained Shares Method) | $ (879,134.01) | $ (10,444.83) | No Losses |

### ii. Approximate Losses Suffered

Courts that primarily equate financial interest with approximate losses suffered begin with a four factor test.[10]   In applying this test, a district court looks to: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered." *Richardson v. TVIA*, 2007 U.S. Dist. LEXIS 28406, at \*11 (quoting *In re Olsten*, 3 F. Supp. 2d at 295) (quotation marks omitted).   Although the second factor does occasionally hold some significance, courts that apply this test generally place the greatest emphasis on the final factor: approximate losses suffered.  *Richardson v. TVIA*, 2007 U.S. Dist. LEXIS 28406, at \*13-14 (citing *In re Vicuron Pharma., Inc. Sec. Litig.*, 225 F.R.D. 508, 510-11 (E.D. Pa. 2004); *Takara Trust v. Molex, Inc.*, 229 F.R.D. 577, 579 (N.D. Ill. 2005)); *see also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 395 (S.D.N.Y. 2008) (citations omitted).  As a result, where courts in this category tend to diverge is in the accounting method they apply to calculate each movant's approximate losses suffered.  Two competing methods exist: (1) the first in, first out method ("FIFIO"), and (2) the last in, first out method ("LIFO").  The Court will consider each factor in turn.

The first factor of the *Olsten* test requires this Court to look at the number of shares purchased during the Class Period.  This factor favors Marcus.  According to St. Louis PRS, Marcus purchased 37,500 shares of Intuitive stock during the class period.  St. Louis Opp'n 9.  Neither Marcus nor Perlmutter disputes this number.  In contrast, St. Louis PRS purchased 7,900 shares; Perlmutter purchased 45 shares.  *Id.*

---

[10] This test appears to have been first introduced by the court in *Lax v. First Merchants Acceptance Corp.*, 1997 U.S. Dist. LEXIS 11866, at \*17 (N.D. Ill. Aug. 6, 1997).  Nevertheless, some courts credit the test to the court in *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 295 (E.D.N.Y. 1998) (citing *Lax*).

12

**United States District Court**
For the Northern District of California

1    The second factor requires the Court to look at the number of net shares purchased during

2 the class period.  This factor weighs in favor of St. Louis PRS, which purchased a net of 4,400

3 shares of Intuitive stock during the Class Period.   St. Louis Opp'n 9; Perlmutter Opp'n 7.

4 Perlmutter's net purchases during the Class Period amount to only 45 shares.  Perlmutter Opp'n 7.

5 Marcus actually sold 18,500 more shares during the Class Period than he purchased.   In other

6 words, Marcus was a net seller during the Class Period.

7    Both St. Louis PRS and Perlmutter argue that Marcus' status as a net seller weighs against

8 his financial interest in the litigation.  St. Louis Opp'n 12-14; Perlmutter Opp'n 5-7.  In general, net

9 purchasers have a greater interest in a securities lawsuit because a net purchaser was induced by the

10 fraud to purchase shares and has been left "holding the bag" when the fraud is eventually revealed.

11 *In re McKesson*, 97 F. Supp. 2d at 996-97.  In contrast, a net seller arguably profits more from the

12 fraud than suffers from it.  *Id.* at 997.  Courts have found that this presumption applies only when a

13 net seller is also a net gainer.  *See Richardson v. TVIA*, 2007 U.S. Dist. LEXIS 28406, at *12.  A

14 net gainer is a party who profited from the purchase and sale of a defendant's stock during the class

15 period.  *See In re Bausch & Lomb Inc. Sec. Litig.*, 244 F.R.D. 169, 173-74 (W.D.N.Y. 2007) (citing

16 numerous cases that rejected applications for lead plaintiff status made by "net sellers" and "net

17 gainers"); *see also Hodges v. Immersion Corp.*, 2009 U.S. Dist. LEXIS 122565, *6-7 (N.D. Cal.

18 Dec. 21, 2009).  According to St. Louis, Marcus gained $ 2.3 million in Class Period transactions[11]

19 and thus qualifies as a net seller and a net gainer.  St. Louis Opp'n 12.

20    Although he does not object to his status as a net seller, Marcus contends that he did not

21 benefit from the fraud and should not be considered a net gainer.  Because Marcus sold more

22 shares of Intuitive stock during the Class Period than he purchased, Marcus must have purchased

23 some of the shares that he sold during the Class Period prior to the start of the Class Period.

24 Marcus pointed out at oral argument that St. Louis PRS's calculation fails to account for these

25 expenditures.  In other words, Marcus claims that St. Louis overstates his gains because St. Louis

26 does not account for all of his costs.  For example, under St. Louis' method of calculation, if

_____

[11] St. Louis PRS calculated this number by subtracting the amount Marcus spent purchasing shares during the Class Period ($6.9 million) from the amount that he gained from selling those shares during the Class Period ($8.6 million).  *Id.*

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

1    Marcus purchased a share of intuitive stock prior to the Class Period for $100 and then sold that

2    share of stock during the Class Period for $90, Marcus would recognize a Class Period gain of $90.

3    The same would be true if Marcus originally purchased the share for $80; his Class Period gain

4    would still be $90.

5           Marcus' concern is well founded.  Any enterprise would show much higher profits if it did

6    not have to deduct associated costs.  Indeed, Marcus may be correct that taking into account all of

7    his sales and purchases would show a net loss, not a net gain.  Marcus' argument fails, however,

8    because it ignores the purpose of the net seller and net gainer inquiries.

9           The purpose of isolating the calculation of net sales and net gains to the Class Period is to

10   determine whether a party potentially benefitted from the fraud.  *See In re Bausch & Lomb*, 244

11   F.R.D. at 173-74 ("Courts have consistently rejected applications for lead plaintiff status made by

12   'net sellers' and 'net gainers,' recognizing that they may in fact have profited, rather than suffered,

13   as a result of the inflated stock prices.") (citing cases).  This is not the same as determining whether

14   a party lost or earned money trading in a particular stock.  As alleged in the complaint, Defendants'

15   fraud artificially inflated Intuitive's stock price during the Class Period.   Thus, when Marcus

16   purchased Intuitive stock prior to the Class Period, he purchased it at fair market value.  When he

17   sold it during the Class Period, however, he sold it at fraudulently inflated prices.  As a result,

18   instead of being injured by the fraud on these sales, Marcus actually benefitted from the fraud.

19   Furthermore, the fact that Marcus received more money from selling stock at fraudulently inflated

20   prices than he spent purchasing stock at inflated prices makes it more likely that Marcus benefitted

21   from Defendants' alleged fraud.   Even if Marcus lost money in all of his Intuitive stock

22   transactions, this amount was reduced by his Class Period sales when the stock prices were

23   inflated.  *See id*. at 173 ("[E]ven if [the movant] ultimately suffered a loss, that loss was less than it

24   would have been had the bonds been trading at fair market value.").  Therefore, Marcus' status as a

25   net seller and a net gainer during the Class Period weighs against Marcus' appointment as the lead

26   plaintiff.  Besides demonstrating that he potentially benefitted from Defendants' fraud, Marcus'

27   status as a net seller and a net gainer also weighs against him because it may subject him to unique

28

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

*United States District Court*
For the Northern District of California

1    defenses if he were to be the class representative.  *See id.* at 174 (citing 15 U.S.C. § 78u-

2    4(a)(3)(B)(iii)(II)).

3         The third factor in the four factor test requires the Court to consider the total net funds

4    expended during the class period.  This is calculated by looking at the total cash outlays on

5    Intuitive stock during the Class Period and subtracting any cash receipts during the same period.

6    *See In re McKesson*, 97 F. Supp. 2d at 996.  This factor weighs in favor of St. Louis PRS.  St.

7    Louis PRS expended $901,465.59 more than it received during the Class Period.  St. Louis Opp'n

8    9; Perlmutter Opp'n 7.  In comparison, Perlmutter's net funds expended during the Class Period

9    amounted to only $14,972.85.  Just as he sold more shares than he purchased during the Class

10   Period, Marcus also received between $2,307,352.25 and $2,307,389.53[12] more from Intuitive

11   stock transactions during the Class Period than he expended.

12        The fourth and final factor requires the Court to determine the approximate losses suffered

13   by the movants during the Class Period.  This factor is the most determinative.  *Varghese v. China*

14   *Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 395 (S.D.N.Y. 2008) (citations omitted);

15   *Richardson v. TVIA*, 2007 U.S. Dist. LEXIS 28406, at *13-14 (citing *In re Vicuron Pharma., Inc.*

16   *Sec. Litig.*, 225 F.R.D. 508, 510-11 (E.D. Pa. 2004); *Takara Trust v. Molex, Inc.*, 229 F.R.D. 577,

17   579 (N.D. Ill. 2005)).  Two different accounting methods exist for calculating losses: (1) the first

18   in, first out method ("FIFO") and (2) the last in, first out method ("LIFO").  "Under FIFO, stocks

19   which were acquired first are assumed to be sold first for loss calculation purposes."  *Vladimir v.*

20   *Bioenvision*, 07 Civ. 6416, 2007 U.S. Dist. LEXIS 93470, *18 (S.D.N.Y. Dec. 21, 2007) (citations

21   omitted).  "Under LIFO, stocks which were acquired most recently are assumed to be sold first."

22   *Id.* (citations omitted).

23        St. Louis PRS argues that courts favor LIFO over FIFO.  St. Louis Opp'n 9.  Marcus

24   conceded at oral argument that FIFO is the minority view but contends that FIFO is still a widely

25   accepted method of calculating losses at all stages of securities fraud litigation.  Marcus Reply 5.

26   Both parties' positions find support in decisions by judges in this district.  *Compare Richardson v.*

27

28   ────────────────────
     [12] St. Louis and Perlmutter provide these slightly different estimates.  St. Louis Opp'n 9; Perlmutter
     Opp'n 7.

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

*United States District Court*
For the Northern District of California

1   *TVIA*, 2007 U.S. Dist. LEXIS 28406, at *14 ("In calculating the approximate losses suffered,

2   courts have used the 'last in, first out' (LIFO) method . . . .") (citations omitted), *and Weisz v.*

3   *Calpine Corp.*, No. C 02-1200 SBA, 2002 U.S. Dist. LEXIS 27831, at *26-27 (N.D. Cal. Aug. 19,

4   2002) ("[B]ecause [FIFO] encompasses purchases made outside the class period, courts have

5   generally rejected FIFO as an appropriate means of calculating losses in securities fraud cases.")

6   (citations omitted), *with In re UTStarcom, Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 48122, at *20

7   (N.D. Cal. May 12, 2010) ("The Court has accepted calculations of harm under FIFO at the class

8   certification stage and in appointing lead plaintiffs.") (citations omitted), *and Hodges v. Akeena*

9   *Solar, Inc.*, 263 F.R.D. 528, 532 (N.D. Cal. 2009) (stating that courts "may . . . look to the 'first-in,

10  first-out' ('FIFO') method" in determining financial interest).  As a result, the Court will consider

11  the movants' losses as calculated by both methods.  However, the Court finds the arguments in

12  favor of LIFO more persuasive and will place more weight on the losses calculated using that

13  method.

14        Courts that prefer LIFO over FIFO claim that "[t]he main advantage of LIFO is that, unlike

15  FIFO, it takes into account gains that might have accrued to plaintiffs during the class period due to

16  the inflation of the stock price." *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101 (S.D.N.Y. 2005)

17  (footnote omitted).  In the main case cited by Marcus in support of his argument, *Jaffe Pension*

18  *Plan v. Household Intern., Inc.*, No. 02 C 5893, 2010 U.S. Dist. LEXIS 123486, at *24-25 (N.D.

19  Ill. Nov. 22, 2010), the court also recognized that FIFO may inflate damages because it does not

20  consider gains obtained from sales of stock during the class period.  The court in *Jaffe* claimed,

21  however, that FIFO's main shortcoming is eliminated by netting a plaintiff's total loss with the

22  gains obtained during the class period.  *Id.*  Thus, it appears that even courts applying FIFO prefer

23  to net a plaintiff's losses against any profits made during the class period in order to ensure that a

24  plaintiff does not overstate his losses.

25        Marcus does not, however, appear to have offset his losses under FIFO with his gains

26  during the Class Period.  This leads the Court to infer that Marcus' stated FIFO losses may be

27

28

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

**United States District Court**
For the Northern District of California

1  inflated.  Nevertheless, the Court notes that Marcus' stated FIFO losses of $2,009,678.04 are much

2  greater than either St. Louis PRS's losses of $477,070.85 or Perlmutter's losses of $10,444.83.[13]

3          Now that the Court has compared the movants' FIFO losses, the Court will compare the

4  movants' LIFO losses.  St. Louis PRS not only argues that this Court should adopt LIFO instead of

5  FIFO, it also suggests that this Court should distinguish between two methods of calculating LIFO.

6  St. Louis Opp'n 10.  One is the non-strict LIFO approach; the other is the strict LIFO approach.  *Id.*

7  Although St. Louis PRS provides definitions for these approaches, it does not cite any cases that

8  utilized these more nuanced versions of the LIFO accounting method.  In fact, none of the cases

9  that St. Louis PRS cites in support of its argument that this Court should favor LIFO over FIFO

10  discuss non-strict LIFO or strict LIFO.  Nevertheless, using either the non-strict or the strict LIFO

11  method, St. Louis PRS's losses exceed both Marcus' and Perlmutter's losses.[14]

12          The chart which appears at the end of this subsection summarizes how each movant fares

13  on each of the *Olsten* factors.  This inquiry makes clear that Perlmutter does not possess the largest

14  financial interest in this litigation because none of the factors weigh in his favor.  Thus, the

15  comparison is between St. Louis PRS and Marcus.  Marcus purchased, by far, the most Intuitive

16  stock during the Class Period.  Marcus also, however, sold more stock during the Class Period than

17  he purchased and received more funds from his Class Period stock transactions than he expended.

18  St. Louis PRS, on the other hand, purchased several thousand more shares during the Class Period

19  than it sold and expended nearly $1 million more dollars during the Class Period on Intuitive stock

20  than it received from the sale of Intuitive stock.  Therefore, the first three factors weigh in favor of

21  St. Louis PRS.

22

23  [13] Marcus also contends that FIFO is appropriate here because it is used across the country to
allocate settlement proceeds to class members.  Marcus Reply 6.  Nevertheless, as the court in *City
of Monroe Employees' Ret. Sys. v. Hartford Fin. Servs. Group*, 269 F.R.D. 291, 295-96 (S.D.N.Y.
24  2010) observed, the better method to apply in determining financial interest is the method of loss
calculation that will be applied at trial.  This is not to say that the Court is determining which
25  method will be used to calculate damages at trial in this Order.  Rather, this is to say that because
Marcus' argument deals with calculating damages at settlement and not at trial, it fails to persuade
26  this Court, in light of the other considerations outlined above, that FIFO should be used instead of
LIFO.
27  [14] Under St. Louis PRS's application of both the non-strict and strict LIFO tests, the Court is to
exclude alleged losses recognized on shares that were bought and sold before the fraud was
28  disclosed.  St. Louis Opp'n 10.

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

Although it is somewhat ambiguous, the fourth, and most important factor also favors St. Louis PRS.  Even though Marcus claims the largest approximate loss, he calculated his losses using FIFO.  As stated, FIFO tends to overstate losses unless certain adjustments are made. Because Marcus does not appear to have made these adjustments, his FIFO losses may exaggerate his actual losses.  Using LIFO, the method favored by a majority of courts, St. Louis PRS has the greatest losses.  The fact that St. Louis PRS's losses remain relatively consistent across the different methods of calculations further weighs in favor of St. Louis PRS.  Marcus' losses, on the other hand, vary greatly depending on the method of calculation used.

In conclusion, the Court finds that the *Olsten* test favors deeming St. Louis PRS as the plaintiff with the largest financial interest in the litigation because St. Louis PRS has the largest approximate losses using the most widely adopted method of calculation and because Marcus is a net seller who gained more money during the Class Period than he expended.

| | Movants | | |
|---|---|---|---|
| *Olsten* Factors | St. Louis PRS | Perlmutter | Marcus |
| Number of Shares Purchased During the Class Period | 7,900 | 45 | 37,500 |
| Number of Net Shares Purchased During the Class Period | 4,400 | 45 | (18,500) |
| Total Net Funds Expended During the Class Period | $ (901,465.59) | $ (14,972.85) | $ 2,307,352.25[15] <br> $ 2,307,389.53[16] |
| Approximate Losses Suffered: | | | |
|     FIFO | $ (477,070.85) | $ (10,444.83) | $ (2,009,678.04) |
|     LIFO | $ (463,563.54) | $ (10,444.83) | Not available |
|     Non-Strict LIFO | $ (694,141.81) | $ (10,444.83) | $ 0 |
|     Strict LIFO | $ (367,251.00) | $ (10,444.83) | $ (194,135.37) |

---

[15] This is according to St. Louis PRS.  St. Louis Opp'n 9.
[16] This is according to Perlmutter.  Perlmutter Opp'n 7.

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

### iii.  Tax Laws

Besides advocating for FIFO, Marcus also argues that this Court should allow him to calculate his loss using the method mandated by the United States tax laws.  Marcus Reply 5. Although Marcus claims that this method is closest to the true economic impact of his transactions, Marcus cites no district court decisions which applied tax laws to determine the financial interests of potential lead plaintiffs in securities class action lawsuits.   This is in contrast to the methodologies applied above, all of which found support in various district court decisions. Without finding more support for Marcus' proposed method, the Court is hesitant to find that the tax laws represent a rational method for determining which movant has the most to gain from this lawsuit.   Moreover, Marcus fails to explain how the tax law methodology differs from FIFO. According to Marcus, tax laws require that each sale of a share of stock is charged against the earliest share purchased.  *Id.*  This description appears very similar to the conventional definition of FIFO.  Marcus, however, does not explain why his loss as calculated in accordance with tax laws is so much greater than his loss calculated using FIFO.   For these reasons, this Court declines to consider Marcus' claimed tax loss in determining the movant with the greatest financial interest.

### iv.  Conclusion

Based on the retained shares test and the *Olsten* test, St. Louis PRS possesses the largest financial interest in the litigation.  Accordingly, this Court determines that St. Louis PRS possesses the largest financial interest in the litigation.[17]

### 2.  Rule 23 Requirements

In order to be designated the presumptive lead plaintiff, St. Louis PRS must show that it satisfies Rule 23 requirements.  This showing need not be as thorough as what would be required on a class certification motion.  *See Zhu v. UCBH Holdings, Inc.*, 682 F. Supp. 2d 1049, 1053 (N.D. Cal. 2010) ("Although the inquiry at this stage of the litigation is not as searching as the one

---

[17] Even if the Court were to find that Marcus was the plaintiff with the largest financial interest in the litigation, Marcus' status as a net seller and a net gainer during the Class Period undermines his contention that he would be a typical and adequate class representative.  Marcus may also be subject to unique defenses which further undermines his ability to meet the Rule 23 requirements. A further indication of the fact that Marcus is not typical of this Class is Marcus' indication at the hearing that the Class Period may need to be modified because of Marcus' transactions during the Class Period.

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

triggered by a motion for class certification, the proposed lead plaintiff must make at least a preliminary showing that it meets the typicality and adequacy factor.").[18]  As the court in *In re Cavanaugh* directed, this Court will focus on the typicality and adequacy requirements.

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quotation and quotation marks omitted).  Based on the information available to the Court, the Court finds that St. Louis PRS's claims in this action arise out of the same conduct as the claims of the other members of the class.  St. Louis Mot. 5.  The Court also finds that St. Louis PRS has suffered the same injury as other plaintiffs, that is the purchase of Intuitive stock during the Class Period at prices artificially inflated by Defendants' materially false and misleading statements and omissions.  *Id.*

The test for adequacy asks whether the class representative and his counsel "have any conflicts of interest with other class members" and whether the class representative and his counsel will "prosecute the action vigorously on behalf of the class."  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).  The Court finds that St. Louis PRS has no conflicts with the other class members and that it is committed to prosecuting this action.  St. Louis Mot. 5.  St. Louis PRS also asserts that its chosen counsel, Abraham, Fruchter & Twersky is highly qualified and capable of conducting this litigation.  *Id.* at 6.

Because St. Louis PRS has the largest financial interest and has made a preliminary showing that it satisfies the typicality and adequacy requirements of Rule 23, the Court appoints St. Louis PRS as the presumptive lead plaintiff.

///

///

---

[18] Defendants argue that the Court's determination as to whether any movant satisfies Rule 23 for purposes of appointment as lead plaintiff does not preclude Defendants from later arguing at class certification that the lead plaintiff does not satisfy the requirements of Rule 23.  *See* Dkt. No. 24. Given that the appointed lead plaintiff must only make a preliminary showing of adequacy and typicality at this stage of the litigation, the Court agrees that Defendants may still challenge at class certification whether the appointed lead plaintiff satisfies Rule 23.

20

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION

United States District Court
For the Northern District of California

**C.  Rebuttal of Presumptive Lead Plaintiff**

The Court will consider whether Perlmutter or Marcus can rebut St. Louis PRS's showing that it satisfies Rule 23.  Perlmutter makes two arguments against St. Louis PRS.  First, Perlmutter argues that St. Louis PRS's failure to file a complaint in this action weighs against its appointment as lead plaintiff.  Perlmutter Opp'n 9.  The PSLRA, however, does not require parties who wish to move for appointment as lead plaintiff to file a complaint.  Perlmutter concedes this.  *Id.* at 9-10. St. Louis PRS complied with the PSLRA by moving for appointment as lead plaintiff in response to Perlmutter's notice of his complaint.  As a result, Perlmutter's first argument fails.

Second, Perlmutter and Marcus argue that St. Louis PRS is not an adequate class representative because St. Louis PRS submitted inaccurate information regarding its stock trades. Dkt. No 28 ("Perlmutter Reply"), at 6-7; Marcus Reply 10.  Specifically, Perlmutter, and Marcus, claim that St. Louis reported trades at prices outside the range of prices for Intuitive stock on the dates reported.  *Id.*  St. Louis PRS, however, proffered a reasonable explanation for the alleged inaccuracy.  According to St. Louis PRS, the trading prices it reported go beyond the range of trading prices for that day because St. Louis PRS engaged in after-hours trading.  Dkt. No. 26 ("St. Louis Reply"), at 7.  As alleged by St. Louis PRS, after-hours trading prices are not listed.  Thus, St. Louis claims that its certification of its stock trades is correct.  *Id.*

Because neither Perlmutter nor Marcus rebutted St. Louis PRS's showing that it satisfies Rule 23, this Court hereby appoints St. Louis PRS as lead plaintiff of this action.  This decision to appoint St. Louis PRS, an institutional investor, also comports with the PSLRA's goal to increase the likelihood that institutional investors would serve as lead plaintiffs.  *See Glauser v. EVCI Career Colleges Holding Corp.*, 236 F.R.D. 184, 188 (S.D.N.Y. 2006) ("[T]he PSLRA was passed, at least in part, to increase the likelihood that institutional investors would serve as lead plaintiffs in actions such as this one.") (quoting *In re Veeco Instruments, Inc.*, 233 F.R.D. 330, 332-33 (S.D.N.Y. 2005)) (quotation marks omitted).

**D.  Approval of Lead Counsel**

St. Louis PRS requests that this Court approve its choice of law firm pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v).  St. Louis Mot. 6.  As stated by the Ninth Circuit, "the district court has no

21

authority to select for the class what it considers to be the best possible lawyer or the lawyer offering the best possible fee schedule." *In re Cavanaugh*, 306 F.3d at 733.  The decision of lead counsel belongs to the lead plaintiff.  *Id.* at 734 n.14.  St. Louis has chosen the law firm of Abraham, Fruchter & Twersky to serve as lead counsel.  *Id.*  St. Louis PRS represents that its chosen counsel is fully capable of litigating this case effectively and expeditiously.  *Id.*  "[I]f the lead plaintiff has made a reasonable choice of counsel, the district court should generally defer to that choice." *Cohen*, 586 F.3d at 712 (citations omitted).  Having reviewed the declaration attached to St. Louis PRS's motion outlining the qualifications of the law firm of Abraham, Fruchter & Twerksy, the Court finds St. Louis PRS's choice of lead counsel reasonable.  As such, the Court will defer to St. Louis PRS and appoint the law firm of Abraham, Fruchter & Twerksy as lead counsel in this action.

## IV.  CONCLUSION

For the foregoing reasons, the Court appoints St. Louis PRS as lead plaintiff in this action and approves St. Louis PRS's selection of the law firm of Abraham, Fruchter & Twerksy as lead counsel.  Accordingly, this Court GRANTS St. Louis PRS's motion for appointment of lead plaintiff and approval of its selection of lead counsel.  The Court DENIES Marcus' and Perlmutter's motions.

As stipulated at the hearing, the parties shall abide by the following deadlines:

| | |
|---|---|
| Amended Complaint: | April 1, 2011 |
| Motion to Dismiss: | May 16, 2011 |
| Opposition: | June 30, 2011 |
| Reply: | July 25, 2011 |
| Motion Hearing and CMC: | August 11, 2011 |

**IT IS SO ORDERED.**

Dated: February 15, 2011

*Lucy H. Koh*
_____
LUCY H. KOH
United States District Judge

Case No.: 10-CV-03451-LHK
ORDER GRANTING THE POLICE RETIREMENT SYSTEM OF ST. LOUIS' MOTION