UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| POLICE RETIREMENT SYSTEMS OF ST. LOUIS, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br>v.<br><br>INTUITIVE SURGICAL, INC., ET AL.,<br><br>                Defendants. | Case No.: 10-CV-03451-LHK<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND<br><br>(re: dkt. #48) |

Defendants Intuitive Surgical, Inc., Benjamin Gong, Aleks Cukic, Jerome McNamara, Mark J. Rubash, Gary Guthart, Marshall Mohr, and Lonnie Smith (collectively "Defendants") move to dismiss the claims in this securities class action. Lead Plaintiff Police Retirement Systems of Saint Louis ("Plaintiff") opposes the motion. Pursuant to Civil Local Rule 7-1(b), the Court deems this motion appropriate for resolution without oral argument, and vacates the August 11, 2011 motion hearing. For the reasons explained below, the Court grants Defendants' motion to dismiss with leave to amend. In light of the dismissal, the case management conference scheduled for August 11, 2011 is continued to Wednesday, October 26, 2011 at 2:00 p.m.

**I. Background**

Plaintiff purchased or otherwise acquired Intuitive Surgical common stock between February 1, 2008 and January 7, 2009 inclusive (the "Class Period"). Defendant Intuitive Surgical is a medical device manufacturer of cutting-edge robotic surgery devices used for certain kinds of minimally invasive surgery procedures. First Amended Complaint ("FAC") ¶ 1. Intuitive Surgical's central product is the *da Vinci* System, which costs upward of $1.7 million. *Id*. The *da Vinci* System and its accompanying surgical instruments are "Class II" medical devices, and are subject to extensive regulation by the U.S. Food and Drug Administration ("FDA"). The *da Vinci* System was introduced in the U.S. in 2000 after the FDA approved its use for "general" laparoscopic procedures. Since then, the *da Vinci* System has been approved for prostatectomy procedures (in 2001), other urological procedures (in 2005), and gynecological procedures, including hysterectomy procedures (also in 2005). *Id*. at ¶ 2. Plaintiff refers to *da Vinci* prostatectomy procedures as *dV*P procedures, and refers to *da Vinci* hysterectomy procedures as *dV*H procedures. From 2005 to 2007, Intuitive Surgical increased its total revenues, based on all procedures, over the prior year by more than 60%. *Id*. at ¶ 5.

The individual Defendants were employed at Intuitive Surgical during the Class period: Gong was the Vice President of Finance; Cukic was the Vice President of Business Development and Strategic Planning; McNamara was the Executive Vice President of Worldwide Sales; Rubash was a Director and the designated Audit Committee Financial Expert; Guthart was the President and a Director; Mohr was the Chief Financial Officer; and Smith was the Chief Executive Officer and Chairman of the Board.

Plaintiff alleges that, throughout the Class Period, the individual Defendants were repeatedly asked about the effects of the economic crisis, and "steadfastly" assured analysts and investors that "the economic crisis was not negatively impacting da Vinci sales and revenues," when in truth, the economic crisis was negatively impacting Intuitive Surgical's sales and revenues. *Id*. at ¶ 8. Moreover, by the end of 2007 and unbeknownst to investors, Intuitive Surgical "had reached a ceiling" as to the growth rate for some its most popular procedures. Finally, and also by the end of 2007, Intuitive Surgical had essentially "saturated" the market for

first-time placement of the *da Vinci* System in key regions of the U.S., thus making further growth difficult. *Id*. at ¶ 7. To support its allegations, Plaintiff relies on Intuitive Surgical's public filings with the U.S. Securities and Exchange Commission ("SEC"), other publicly available information such as news and financial analyst reports, and interviews with former Intuitive Surgical employees and independent contractors, identified by Plaintiff as "Corroborating Witnesses." According to these Corroborating Witnesses, Intuitive Surgical had an extensive and accessible tracking system, which allowed employees, including the individual Defendants, to access information on every procedure performed. *Id*. at ¶ 254.

Plaintiff alleges nineteen false and/or misleading statements or omissions covering four "Analyst Calls" in 2008, in which various individual Defendants made statements about Intuitive Surgical's financial results and prospects. Statements 1-5 concern the first Analyst Call on January 31, 2008. Statements 6-9 concern the second Analyst Call on April 17, 2008. Statements 10-14 concern the third Analyst Call on July 22, 2008. Statements 15-19 concern the fourth Analyst Call on October 16, 2008.

**January 31, 2008 Analyst Call**

**Statement 1**

During the January 31, 2008 Analyst Call, Defendant Gong [Intuitive Surgical's Vice President of Finance] stated "Starting with procedures, we continue to expect *dV*P and *dV*H adoption to grow in our 2008 recurring revenues. For 2008, we expect *dV*P procedures to grow approximately 40% from a base of approximately 55,000 procedures performed in 2007. And we expect *dV*H to grow approximately 150% from a base of approximately 13,000 procedures performed in 2007. . . . Overall we expect total procedures to grow at least 55% in 2008 from a base of approximately 85,000 procedures performed in 2007. . . . We expect our total 2008 revenues to grow approximately 40% over 2007. Instrument and accessory revenues, which are specifically driven by procedures performed, are expected to grow approximately 55% over 2007. We expect this growth to result from procedures performed on new system placements as well as increased utilization of existing installed systems."

**Statement 2**

During the January 31, 2008 Analyst Call, Deutsche Bank analyst Tao Levy asked, "Okay. And you look [at] the new system sales that are taking place today. Obviously in the past urology was still the drive, it's probably still one of the big drivers. How does gynecology fall into that selling process today?" Defendant Smith stated, "Gynecology plays a bigger and bigger role each day. I would also say that the uptake in gynecology has in many instances put stress on hospitals that only have one [*da Vinci*] system, and I think you've seen again this quarter probably being the strongest side of that, and a total of 20 systems

that went to repeat customers. So gynecology is a big player in that, and I think will continue to be and continue to expand."

### Statement 3

During the January 31, 2008 Analyst Call, Michael Tue, an analyst for Oppenheimer, asked "… it appears that you are at least about 33% penetrated into the Tier 1 hospitals mostly in major metropolitan areas. So, on a go forward basis, how should we think about system placement growth?" Defendant Smith replied, "Again, I think it's important to know when you look at however you want to stratify hospitals and large hospitals or Tier 1 or Tier 2 or Tier 3 that when you're talking about the largest hospitals, our view is that those – and we see it more and more every quarter, that those become very strong candidates for multiple systems. So I would probably push on that math that you did there a little bit."

### Statement 4

During the January 31, 2008 Analyst Call, Derek Lewis, an analyst for Morgan Stanley, asked "On new accounts, is it a safe assumption, as you look at the U.S. business replacements on a go-forward basis, the opportunity in the U.S. is really for existing customers? And we think we have peaked out in terms of new account generation in the U.S.?" Defendant Smith responded, "No. Actually there are a lot of new systems placements…. And really the opportunity here to place systems at hospitals that don't have any is still very, very large."

### Statement 5

During the January 31, 2008 Analyst Call, Michael Tue, an analyst for Oppenheimer, asked "This has been a, the topic that has been discussed for a lot of capital equipment manufacturers, and wanted to find out if you are seeing any sort of slowdown pressure in terms of the overall credit crunch market and anything that's affecting finance?" Defendant Smith responded, "The answer to that is, no. As we've talked to you, we have about half of our sales force right now meeting to – going through their pipeline. And I had [Defendant] McNamara ask them if they've seen any delay because of the credit crunch, and the answer, no one responded with any kind of positive experience there. So no one has seen any deals delay because of it."

### April 17, 2008 Analyst Call

### Statement 6

During the April 17, 2008 Analyst Call, Defendant Gong reassured investors regarding the Company's guidance for fiscal year 2008 and even *increased* guidance for total revenue and system revenue, stating "Now, starting with the procedures, we continue to expect *dV*P and *dV*H adoption to drive the growth in our 2008 recurring revenues. For 2008, we continue to expect *dV*P procedures to grow approximately 40% on a base of about 55,000 procedures performed in 2007. And we expect *dV*H procedures grow to approximately 150% from a base of about 13,000 procedures performed in 2007. With regard to revenue, we expect our total 2008 revenues to grow approximately 42% over 2007, which is up from

4

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

our previous estimate of 40%. Instrument and accessory revenue, which is specifically driven by procedures performed, is on track to grow 55% this year. During Q1, procedures grew in line with our previous estimates. And, therefore, we are maintaining our forecast for 55% growth in instrument accessory revenues for the year. System revenues were modestly stronger than we expected in Q1, and we are increasing our forecast for the year. We are forecasting system revenue to grow 33-35% over 2007, which is up from our previous forecast of 30% growth. We expect this growth to come from an increase in shipments." This false and misleading statement or omission regarding the Company's guidance was repeated in the Company's quarterly report filed with the SEC on Form 10-Q filed on April 18, 2008, and signed by Defendant Mohr.

**Statement 7**

During the April 17, 2008 Analyst Call, Cowen and Company analyst Eli Kammerman asked, "[W]ith the very small sequential decline in systems you had for the quarter what do you think this says for the pattern of seasonality that you expect to see this year? Are you expecting to see relatively level system sales through the year, or do you think we'll see the same kind of thing as we saw in '07, where the fourth quarter was significantly higher than the first?" Defendant Gong replied, "I think seasonality is going to be similar, as far as we know. It was sequentially down in Q1 this year, as it has been in previous years. We expect Q4 to be our highest quarter. But, that said, we think the total number is going to increase year-over-year by between 33 and 35%."

**Statement 8**

During the April 17, 2008 Analyst Call, Deutsche Bank analyst Tao Levy asked, "Anything on capital equipment spending that you're hearing from your sales reps?" Defendant Gong replied, "No, we're not hearing anything there. I know over the quarter we've had various questions as to whether or not there's been an impact due to credit issues. And as far as we can tell, we haven't had any impact to our system sales."

**Statement 9**

During the April 17, 2008 Analyst Call, Bear Stearns analyst Rick Wise asked "… The anxiety over [capital] spending and hospital credit, I don't know if it is a question for [Defendant Smith] or [Defendant Mohr] but – when you look at the environment, or your conversations with hospitals or decision-makers, is there anything in the external environment that makes you incrementally more concerned as you look out over the next 12 months in the U.S. versus where you might have felt six months ago, just in that external environment?" Defendant Smith replied, "On the external side, I'll try to answer that. I don't get any – I'm still not getting any feedback from the sales organization that there's pressure. Some hospitals are in better shape than others. But there's always a decision within a hospital of how do they prioritize their capital investment. And I think we come up typically fairly high on that priority list…. We aren't hear[ing] anything that causes us any significant concern. I've got lots of concerns about other things we ought to be running, but that one has not yet looked like a real issue. So, I don't have any different news than we had; no change from last quarter, I guess, is the simple way to state it."

**July 22, 2008 Analyst Call**

**Statement 10**

During the July 22, 2008 Analyst Call, Defendant Gong stated, "Based on our second quarter results, we are increas[ing] our previous guidance for revenue and profits for 2008. Starting with procedures, we are seeing higher growth rates across a number of different procedures, and we expect our total procedures to grow 57 to 58% this year, up from our previous forecast of 55% growth. [$dV$H] continues to be one of our fastest growing procedures, and we continue to expect this procedure to grow at least 150% this year from a base of approximately 13,000 procedures performed last year. [$dV$P] has continued to grow strong, but has been growing less than our previous forecast of 40%. We now expect our $dV$P procedures to grow between 35 and 39% this year from a base of approximately 55,000 procedures performed last year. At the same time, our newer emerging procedures, such as nephrectomies, vasectomies, and sacrocoplexies, are growing much faster than we previously expected, and therefore we have increased our overall procedure growth estimate for the year from 57 to 58% from a base of approximately 85,000 total procedures performed in 2007. We are increasing our top line revenue guidance for 2008. We now expect revenue to grow 45 to 47% over 2007, which is up from our previous estimate of 42%. We had strong sequential growth in instrument and accessory revenues during Q2, and we are increasing our estimate for annual growth. Instrument and Accessory revenue is expected to grow 57% to 58% this year. This is up from our previous estimate of 55% growth. System revenues in Q2 were also stronger than previously expected, driven primarily by our overall procedure growth. We are now forecasting system revenue to grow 38 to 40% over 2007, which is up from our previous forecast of 33-35% growth. We expect this growth to come from an increase in unit shipments." Defendant Cukic had stated earlier on the July 22, 2008 Analyst Call, "We also saw solid growth within our $dV$P business…." This false and misleading statement or omission regarding the Company's guidance was repeated in the Company's quarterly report filed with the SEC on Form 10-Q on July 25, 2008, and signed by Defendant Mohr.

**Statement 11**

During the July 22, 2008 Analyst Call, Deutsche Bank analyst Tao Levy asked, "[Defendant Gong], you talked about sequentially being down Q3 because of seasonality, and then up in Q4 … do you think seasonality will become [] more felt and that's kind of how we should be thinking in our model?" Defendant Gong replied, "We have had seasonality in previous third quarters in that the growth for procedures has always been lower, so we would anticipate the same kind of lower procedure growth, and it was a pretty strong quarter for system placements in Q2. We are forecasting that Q3 system placements might be relatively flat for Q3 from Q2, and then again higher in Q4."

**Statement 12**

During the July 22, 2008 Analyst Call, Leerink & Swann analyst Rick Wise noted that 18 of 79 system purchases were to current accounts and asked, "Maybe just give us a little color on why that, second, third, or fourth system was bought. Was it for new procedures, [or] was it higher volume in [$dV$P]? Any clear trend there, [Defendant Cukic]?" Defendant Cukic responded, "Well, I think the answer is probably yes in some instance to all of those

6
Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

questions…. So those procedures, GYN procedures specifically, if you go back to the GYN approval that we received in '05 and you sort of map this out over that period, you'll see that the addition of those procedures has required a lot of hospitals to get third and fourth systems.  And we see that continuing."

### Statement 13

During the July 22, 2008 Analyst Call, Leerink & Swann analyst Rick Wise asked, "[O]n the [*d*VP], sort of slightly lower guidance.  Obviously these are small numbers, but just to understand how you are looking at it.  Does this suggest in any kind of way that you have hit a market penetration ceiling, if you will, in [*d*VP], or, or [is] that clearly offset by all of the emerging procedures?"  Defendant Smith replied, "Well, we don't think we have a penetration ceiling."  Defendant Cukic added in terms of the offset by new procedures, "We talked about [*d*VH], it's a market of 250,000 or more procedures in the United States alone.  Potentially renal cancer is another 50,000. Sacrocolpopexy, the number just really grows.  So you – you're really – I mean struggling to get full attention in everyone of our opportunities, which is a nice high class problem, but they are making tradeoffs as well.  So do we – do we think – that, the remaining procedures are going to come our way?  We do."

### Statement 14

During the July 22, 2008 Analyst Call, Oppenheimer analyst Amit Hazan asked, "[I]t does look like the second half of the year is going to grow slower in terms of system sales…. I was just wondering, because we get the question all of the time, if you can answer again the question about changes in hospital spending patterns on capital equipment.  Have you seen any of that?  Or if your guidance at all implies any slowdown that you have seen?"  Defendant Gong replied, "Certainly not.  We have actually not seen any impact on let's say credit crunch on the buying patterns of our customers.  We get that question often, we've had it for the past six months and the answer is still the same.  We have not seen any impact on the buying patterns."

### October 16, 2008 Analyst Call

### Statement 15

During the October 16, 2008 Analyst Call, Defendant Gong stated, "Based on our third quarter results, we are increasing our previous guidance for revenue and profits for 2008.  Starting with procedures, our *d*VH procedures are the greatest contributor to our overall growth.  We continue to expect our *d*VH procedures to grow approximately 150% in 2008 over 2007.  With regard to *d*VP procedures, as [Defendant Cukic] mentioned, our growth in *d*VP lagged behind our expectations, particularly in Europe.  We continue to see *d*VP growth, but lower than our previous forecast.  We expect our worldwide *d*VP growth for 2008 to be greater than 30% over 2007.  Other procedures such as nephrectomies, partial nephrectomies, cystectomies, and sacral colpepresxies are growing much faster.  And as a result, our Q3 procedures in total were in line with our expectations and we continue to expect our total procedures to grow 57-58% this year from a base of approximately 85,000 procedures performed in 2007. … We are now forecasting our system revenues to grow 45-46% over 2007, which is up from our previous forecast of 38 to 40% growth…. In

7

summary, we are increasing our top-line revenue forecast for 2008.  We now expect revenues to grow 49 to 50% over 2007, which is up from our previous estimate of 45 to 47%." This false and misleading statement regarding the Company's guidance was repeated in the Company's quarterly report filed on Form 10-Q with the SEC on October 17, 2008, signed by Defendant Mohr.

**Statement 16**

During the October 16, 2008 Analyst Call, Deutsche Bank analyst Tao Levy asked, "[W]ith the economic crisis, credit environment, how do we factor – or how do you guys factor that into your fourth quarter and 2008 thinking, seeing much or any impact?"  Defendant Smith replied, "You guys probably know more than we do.  Clearly it's not a positive for anyone.  We haven't seen a significant impact yet.  And that is all I can say, is yet…. And [Defendants Gong and Cukic] can deal with this better than I can in terms of doing leases but I suspect that they may increase – our leasing companies still have an appetite for these devices."

**Statement 17**

During the October 16, 2008 Analyst Call, Deutsche Bank analyst Tao Levy asked, "And in terms of feedback from the sales force, and in terms of like cancellations or delays in orders, anything that's different than what you may have seen, call it three months ago, or it's always challenging?"  Defendant McNamara replied, "Well, we're reservedly optimistic, we came off a good quarter for pipeline closing and pipeline development, and the reports back from the field suggest that that's continuing.  We're in a dynamic time, we're just going to work through it."

**Statement 18**

During the October 16, 2008 Analyst Call, Leerink Swann analyst Rick Wise asked, "[T]he whole capital spending trends just – where do you think we are over the next 6 to 12 months, and we keep – I keep reading *The Times*, we're doing surveys and we're really getting a lot of conflicting messages.  Just again, your larger picture?"  Defendant Smith responded, "Well, as I started out when I talked to Tao [Levy], I wish we had a crystal ball.  We don't.  I think this thing is from day-to-day…. And my point is – I understand.  I don't know if that this is a one-quarter deal or it's a two-quarter deal, or it's a year or two.  But we will come out stronger…."  Defendant Cukic replied, "When you look at our value proposition, which is directed at capital expenditures, I think from a hospital standpoint and microeconomics, we sit in a pretty good position.  Defendant Gong also replied, "And there is something that we can probably shed some light on is historically we said about 15% of our systems have been leased [through third parties].  That has actually increased a little bit over the past couple of quarters to closer to 20%.  And according to our leasing partners it appears that the credit crunch is causing an increase in financed system purchases, because hospitals are turning to these leasing companies more since their other sources of funding have gotten a little bit tighter.  Those leasing companies, they tell us, have plenty of capacity and we get calls from them all of the time.  So … I just want to say there is certainly from our perspective availability from a leasing standpoint."

8

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

**Statement 19**

During the October 16, 2008 Analyst Call, JPM Securities analyst Mimi Pham asked, "Okay, and in terms of CapEx [capital expenditures] spending potentially being a tougher decision for the hospitals, are you expecting longer lead times and generally more people and administration being involved in the purchase decision going forward?" Defendant Mohr replied, "At the present time, we don't have any indicators that tell us that's the case or anything has changed. But we're early into this."

Although the alleged misleading statements are lengthy, the thrust of Plaintiff's allegations is that Defendants misled investors about Intuitive Surgical's financial prospects knowing that the financial guidance was false and misleading when issued. Over the course of this period, Intuitive Surgical's stock price fell from $305.61 on February 1, 2008 down to $93.29 on January 23, 2009, a decline of nearly 70%. *Id*. at ¶ 15. Finally, Plaintiff alleges that each of the individual Defendants "reaped significant proceeds from insider sales" based on the false and misleading statements or omissions inflating Intuitive Surgical's stock price during the Class Period. *Id*. at ¶¶ 264-267. Based on these nineteen allegedly false and misleading statements, Plaintiff's Complaint asserts causes of action for alleged violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934.

## II. Discussion

### A. Section 10(b) of the Exchange Act and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). To prevail on its claim that Defendants made material misrepresentations or omissions in violation of § 10(b) and Rule 10b-5, Plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011) (citing *Stoneridge Investment Partners, LLC* v. *Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *see also In re Gilead Sciences*

1   *Securities Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) ("To state a claim under § 10(b), a plaintiff
2   must allege: '(1) a misrepresentation or omission of material fact, (2) scienter, (3) a connection
3   with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss.").

Some forms of recklessness are sufficient to satisfy the element of scienter in a § 10(b) action. *See Nelson v. Serwold*, 576 F.2d 1332, 1337 (9th Cir. 1978). Within the context of § 10(b) claims, the Ninth Circuit defines "recklessness" as a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (en banc) (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)). As explained by the Ninth Circuit in *In re Silicon Graphics Inc. Securities Litig.*, 183 F.3d 970 (9th Cir. 1999), recklessness, as defined by *Hollinger*, is a form of intentional conduct, not merely an extreme form of negligence. *See Silicon Graphics*, 183 F.3d at 976-77.

Plaintiffs must plead any allegations of fraud with particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. *See In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1543 (9th Cir. 1994) (en banc). Pursuant to the requirements of the Private Securities Litigation Reform Act ("PSLRA"), the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Further, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The PSLRA thus requires that a plaintiff plead with particularity "facts giving rise to a strong inference that the defendant acted with," at a minimum, deliberate recklessness. *See Matrixx Initiatives*, 131 S. Ct. at 1323-1324 (assuming, without deciding, that the Ninth Circuit "deliberate recklessness" is sufficient to establish scienter, but noting that allegations as to "forward-looking statements" require actual knowledge).

**B. Misrepresentation or Omission of a Material Fact**

To state a claim pursuant to § 10(b) of the Exchange Act, Plaintiffs must allege, among other things, a misrepresentation or omission of a material fact. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Plaintiff alleges nineteen false or misleading statements in connection with four Analyst Calls. As explained below, Defendants have meritorious arguments that none of the nineteen statements, as currently alleged, is false or misleading.[1] These arguments are broken down into three categories: (1) protected forward-looking statement; (2) mere expression of corporate optimism; and (3) not false.[2]

**1. PSLRA Safe Harbor**

The PSLRA Safe Harbor Provision protects certain "forward-looking statements" from liability. Specifically, the Safe Harbor Provision states in relevant part that:

> a person . . . shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—
>
> > (A) the forward-looking statement is-
> >
> > > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> > >
> > > (ii) immaterial; or
> >
> > (B) the plaintiff fails to prove that the forward-looking statement—
> >
> > > (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
> > >
> > > (ii) if made by a business entity;[,] was—
> > >
> > > > (I) made by or with the approval of an executive officer of that entity; and

---

[1] Defendants, however, have not challenged Plaintiff's allegations with respect to the elements of materiality and loss causation.

[2] The Court notes that Defendants have challenged certain Statements on numerous grounds, e.g., forward-looking statement and not false. In this Order, the Court limits its analysis to the most persuasive ground for dismissal with respect to each of the challenged Statements. The Court, at this time, does not reach the issue of whether those other grounds for dismissal are also meritorious. In light of the Court's granting leave to amend, Plaintiff is on notice of all the potential deficiencies with respect to each Statement and should respond accordingly.

11

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).

Statements Number 1, 6, 10, and 15 all concern Defendants' projections of revenue and procedures for 2008. In these Statements, Defendant Gong relayed Intuitive Surgical's expectations with respect to procedures performed and revenue growth for 2008. Similarly, in Statements 7, 11, and 19, Defendants answered questions regarding revenue and sales forecasts, in which each Defendant expected a positive fourth quarter for 2008. Plaintiff alleges that the financial guidance Statements (e.g., Statements 1, 6, 10, and 15) and the Statements answering questions about revenues and sales forecasts (e.g., Statements 7, 11, and 19) were materially false and misleading because Defendants participating in the 2008 Analyst Calls knew or recklessly disregarded that: (1) Intuitive Surgical would not meet its growth target for *dV*P procedures, an important indicator of the Company's business prospects; and (2) Intuitive Surgical would not be able to offset the drop-off in *dV*P revenues with revenue from other procedures.

As Defendants argue, and Plaintiff does not contest, Statements Number 1, 6, 7, 10, 15, and 19 regarding Intuitive Surgical's revenue guidance and sales forecast are prototypical examples of "forward-looking statements. *See, e.g.*, *In re Accuray*, 757 F. Supp. at 946 ("A forward-looking statement is 'a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items.'" (citing 15 U.S.C. § 78u-5(i)(1)(A)); *see also In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) ("Here, each of the financial forecast statements identified by defendants as forward-looking falls squarely within 15 U.S.C. § 78u-5(i)(1)(A)-(D) as each is a statement predicting the company's future expected sales or other financial results.").

The only dispute is whether Defendants, as required for Safe Harbor protection under subsection (A)(i), provided "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement. Clearly, Defendants did so. A representative of Intuitive Surgical began all four of the Analyst Calls at

12

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

1   issue with a notice that the opinions and statements regarding revenue guidance were forward-

2   looking and that actual results could vary based on risks and uncertainties identified in Intuitive

3   Surgical's filings with the SEC.  *See In re Cutera Sec. Litig.,* 610 F.3d 1103, 1112 (9th Cir. 2010)

4   (finding that defendant properly identified statements as forward-looking by beginning an analyst

5   call with a notice that the remarks and responses contain forward-looking statements and are

6   subject to variance based on certain factors).  Moreover, Intuitive Surgical's SEC filings detailed a

7   number of risk factors including, for example, failure to achieve "market acceptance" by slow

8   adoption of the *da Vinci* System, unforeseen national and global economic downturns, and inability

9   of institutions/doctors to obtain sufficient reimbursement for use of the *da Vinci* System.  *See*

10  Intuitive Surgical Form 10-K 2007 at 21-32, attached as Exh. E to Celio Decl.

11          Accordingly, under the allegations currently pled, Defendants may not be held liable for

12  Statements Number 1, 6, 7, 10, 15 and 19 regarding projected revenues because those statements

13  are subject to PSLRA Safe Harbor protection.[3]

### 2. Expressions of Corporate Optimism

15  "When valuing corporations, however, investors do not rely on vague statements of

16  optimism like 'good,' 'well-regarded,' or other feel good monikers.  This mildly optimistic,

17  subjective assessment hardly amounts to a securities violation.  Indeed, 'professional investors, and

18  most amateur investors as well, know how to devalue the optimism of corporate executives.'"  *See*

19  *In re Cutera*, 610 F.3d at 1111.  "Various circuit courts, including the Ninth Circuit, have held that

20  vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not

21  actionable material misrepresentations under federal securities laws."  *See In re Impac Mortg.*

22  *Holdings, Inc.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Entm't, Inc. v.*

23  *Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir. 2003)).  For example, in *In re Copper Mountain Sec.*

24  *Litig.,* 311 F. Supp. 2d 857, 868-69 (N.D. Cal. 2004) (Walker, J.), the court reasoned that "run-of-

---

[3] As with all the Statements at issue, Plaintiff has failed to adequately allege scienter as to Statement Numbers 1, 6, 7, 9, 10, 15, and 19.  However, because they are forward-looking statements accompanied by meaningful cautionary language, these Statements are not actionable regardless of Plaintiff's showing of scienter.  *See In re Cutera Sec. Litig.,* 610 F.3d at 1112 ("Under subsection (A)(i), however, if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter.").

13
Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

1    the-mill" statements such as "business remained strong" are not actionable under § 10(b) because

2    reasonable investors do not consider 'soft' statements or loose predictions important in making

3    investment decisions."  Similarly, in *In re LeapFrog*, 527 F. Supp. 2d at 1050, the court determined

4    that statements such as "This is going to be a very big second half for us," "Our underlying sell-

5    through at the retail level remained very strong throughout the third quarter," "consumer demand

6    for our learning products is more vibrant than ever," and "We are pleased with our progress . . . we

7    are prepared for the second half of 2004" were similarly vague and amorphous.

8       Here, Defendants argue that Statements Number 4, 13, 17 and 18 are not actionable as

9    merely vague and amorphous statements of corporate optimism.  In Statement Number 4,

10   Defendant Smith responded to a question about Intuitive Surgical's opportunities in the U.S. by

11   stating that "the opportunity here to place systems at hospitals that don't have any is still very, very

12   large."   In Statement Number 13, Defendant Smith stated that "we don't think we have a

13   penetration ceiling," and continued "So do we – do we think – that, the remaining procedures are

14   going to come our way? We do."  In Statement 17, Defendant McNamara replied to an analyst's

15   question by stating, "Well, we're reservedly optimistic, we came off a good quarter for pipeline

16   closing and pipeline development, and the reports back from the field suggest that that's

17   continuing. We're in a dynamic time, we're just going to work through it."  Finally, in Statement

18   18, Defendant Smith noted his belief that "we [Intuitive Surgical] will come out stronger," while

19   Defendant Cukic stated that "we [Intuitive Surgical] sit in a pretty good position" and "there is

20   certainly from our perspective availability from a leasing standpoint."

21      The Court agrees with Defendants.  Statement Numbers 4, 13, 17, and 18 are simply vague

22   assertions of corporate optimism.  Statement 17 even incorporates the phrase "reservedly

23   optimistic."  These Statements, essentially "feel good monikers" that hope springs eternal, do not

24   amount to securities violations under Plaintiff's current allegations.

25      **3.  Not False**

26      Under the PSLRA's particularity requirement, a plaintiff alleging misleading statements or

27   omissions must "specify each statement alleged to have been misleading, the reason or reasons

28   why the statement is misleading, and, if an allegation regarding the statement or omission is made

14
Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

1    on information and belief, the complaint shall state with particularity all facts on which that belief

2    is formed." 15 U.S.C. § 78u-4(b); *see also Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006

3    (9th Cir. 2002) ("In order to survive a motion to dismiss under the heightened pleading standards

4    of the Private Securities Litigation Reform Act ('PSLRA'), the plaintiffs' complaint must specify

5    the reason or reasons why the statements made" were misleading).

6    Defendants argue that the Statements made during the first three Analyst Calls, specifically

7    Statements Number 2-5, 7-9, and 11-14, all having to do with projected systems revenue and the

8    number of procedures performed, are accurate "even with the benefit of hindsight," and thus, in the

9    absence of falsity, cannot be misleading. *See* Defs.' Mot. to Dismiss at 7. In addition, with respect

10   to Statement 16 from the fourth Analyst Call on October 16, 2008 (in which Defendant Smith

11   responded to an analyst's question about the economic crisis by stating "We [Intuitive Surgical]

12   haven't seen a significant impact yet."), Defendants argue that Plaintiff has not specified how or

13   why the Statement is misleading. Plaintiff, in its opposition to the motion to dismiss, makes a

14   curious argument that other information is material. Specifically, Plaintiff argues that five

15   categories of other information were "critically important" and material: (1) the effects of the

16   credit crunch and economic crisis; (2) new *da Vinci* system placements in the U.S., in terms of both

17   new and repeat customers; (3) growth in *dV*P and *dV*H procedures, in terms of system placements;

18   (4) growth in *dV*P and dVH procedures, in terms of instrument and accessory revenue; and (5) the

19   ability of other procedures to offset the deceleration in *dV*P growth. *See* Pl.'s Opp'n at 8. This

20   argument is curious because Defendants have not challenged materiality.

21   In any event, the Court agrees with Defendants that Plaintiff's current allegations do not

22   adequately allege how and why Statements 2-5, 7-9, 11-14, and 16 are misleading. Plaintiff seems

23   to be arguing that the challenged Statements were incomplete. But, for purposes of stating a claim

24   under § 10-b, it is not sufficient for Plaintiff to allege that statements are merely incomplete. *See In

25   re Cutera Sec. Litig.*, 610 F.3d at 1109 ("It is not enough for the investors to plead that Cutera

26   failed to make a full disclosure about its sales force. 'Rule 10b-5 [prohibits] only misleading and

27   untrue statements, not statements that are incomplete. . . . Often, a statement will not mislead even

28   if it is incomplete or does not include all relevant facts.'"); *see also Brody*, 280 F.3d at 1006

15
Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

("Thus, in order to survive a motion to dismiss under the heightened pleading standards of the Private Securities Litigation Reform Act ('PSLRA'), the plaintiffs' complaint must specify the reason or reasons why the statements made by [Defendant] were misleading or untrue, not simply why the statements were incomplete."). The Ninth Circuit has explained a simple rationale for this rule: "No matter how detailed and accurate disclosure statements are, there are likely to be additional details that could have been disclosed but were not." *Brody*, 280 F.3d at 1006.

This is not to say that Plaintiff cannot, without additional factual allegations, state a securities violation, especially in connection with Defendants' non-forward-looking Statements regarding the actual effects of the economy and credit crisis on Intuitive Surgical. Even "a statement that is literally true can be misleading and thus actionable under the securities laws." *Id*. The crucial question, however, is whether Plaintiff has identified a misleading statement or omission. The Court's answer, at least at this stage, is: not yet. As the Court is granting leave to amend, Plaintiff will be given the opportunity to explain, as required by the PSLRA, how and why the Statements at issue are misleading as opposed to just incomplete.

In summary, Plaintiff's Complaint fails to adequately allege a misrepresentation or omission of a material fact, and thus fails to state a claim under § 10(b) of the Exchange Act.

### C. Scienter

Defendants also challenged Plaintiff's allegations as to scienter. Specifically, Defendants argued that Plaintiff simply grouped Defendants into a single mass and made only "Collective Allegations of Scienter." *See* Defs.' Mot. to Dismiss at 22; *see also* Compl. at 80 ("Collective Allegations of Scienter"). The Court need not decide whether Plaintiff's theory of "collective scienter" is viable in these circumstances because of the dismissal on other grounds. In light of the granting of leave to amend, however, the Court offers the following brief discussion.

Under the PLSRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The inference of scienter must be more than merely 'reasonable' or 'permissible' — it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 325. "A complaint adequately pleads scienter under the PSLRA 'only if a

16

1  reasonable person would deem the inference of scienter cogent and at least as compelling as any
2  opposing inference one could draw from the facts alleged.'" *Matrixx*, 131 S. Ct. at 1324 (citing
3  *Tellabs*, 551 U.S. at 324). The Supreme Court has assumed, but not yet expressly decided, that the
4  Ninth Circuit holding that "deliberate recklessness" is sufficient to establish scienter. *Id*. at 1323-
5  24 ("Because Matrixx does not challenge the Court of Appeals' holding that the scienter
6  requirement may be satisfied by a showing of 'deliberate recklessness,' we assume, without
7  deciding, that the standard applied by the Court of Appeals is sufficient to establish scienter.")
8  (internal citation omitted). Finally, the Ninth Circuit has not yet adopted, though has also not
9  totally foreclosed, the theory of "collective scienter." *See Glazer Capital Mgmt., LP v. Magistri*,
10 549 F.3d 736, 744 (9th Cir. 2008) ("Our circuit has not previously adopted a theory of collective
11 scienter.").
12 As the Honorable Richard Seeborg noted in a recent case:

> While the *Glazer* court did not foreclose the possibility of collective scienter, it limited it to "circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Id*. at 744. (emphasis in original) (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008), for an example of such a dramatically false statement where "General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero."). Here, plaintiffs fail to allege any such statements that could be considered "so important and so dramatically false."

18 *In re Nvidia Corp. Secs. Litig.*, Case No. 08-CV-04260-RS, 2010 U.S. Dist. LEXIS 114230, at 39
19 n10 (N.D. Cal. Oct. 19, 2010). Moreover, it is a "rare circumstance" where scienter will be
20 imputed "without accompanying particularized allegations" as to individual corporate officers. *See*
21 *South Ferry LP v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008).
22 Here, at least so far, Plaintiff has failed to allege any such dramatically false statement that
23 would merit the inference of scienter without particularized allegations as to the individual
24 corporate officer Defendant. In fact, Plaintiff has so far failed to adequately allege even a single
25 misrepresentation or omission. Thus, in order to overcome a motion to dismiss with respect to any
26 amended complaint, Plaintiff must either: (1) point to a dramatically false statement that itself
27 creates a strong inference of deliberate recklessness or actual knowledge of falsity; or (2) provide
28 particularize allegations of scienter with respect to each corporate officer Defendant.

17
Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND

### D. Section 20(a) of the Exchange Act

To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law;" and (2) "that the defendant exercised actual power or control over the primary violator." *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Because Plaintiff has failed to plead a primary securities violation, Plaintiff has also failed to plead a violation of Section 20(a).

Accordingly, Defendants' motion to dismiss the Section 20(a) claim is also granted with leave to amend.

### III.  Conclusion

For all of the foregoing reasons, Defendants' Motion to Dismiss is GRANTED with leave to amend.  If Plaintiff wishes to file an amended complaint, **the amended complaint must be filed and served no later than September 12, 2011.**  Plaintiff may not add new causes of action or parties, other than those specified above, without seeking leave of the Court or without obtaining Defendants' permission by stipulation pursuant to Fed. R. Civ. P. 15.  The August 11, 2011 motion hearing is vacated.  The August 11, 2011 case management conference is continued to Wednesday, October 26, 2011.  If Plaintiff files a timely amended complaint and Defendants move to dismiss the amended complaint, the Court will continue the October 26, 2011 case management conference to the same date as the motion hearing.

**IT IS SO ORDERED.**

Dated: August 10, 2011

*Lucy H. Koh*
LUCY H. KOH
United States District Judge