1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| POLICE RETIREMENT SYSTEMS OF ST. LOUIS, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> INTUITIVE SURGICAL, INC., ET AL., <br><br> Defendants. | Case No.: 10-CV-03451-LHK <br><br> ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT <br><br> (re: dkt. #60) |

In this securities class action, Defendants Benjamin Gong, Aleks Cukic, Jerome McNamara, Gary Guthart, Marshall Mohr, Lonnie Smith, and Intuitive Surgical, Inc. (collectively "Defendants"), move pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") to dismiss the Second Amended Class Action Complaint ("SAC"). *See* ECF No. 60 ("Mot."). Lead Plaintiff Police Retirement Systems of Saint Louis opposes the motion on behalf of the class of all plaintiffs ("Plaintiffs"). *See* ECF No. 63 ("Opp'n"). Defendants filed a reply, *see* ECF No. 64 ("Reply"), and the Court held a hearing on the motion on February 16, 2012. For the reasons explained below, the Court grants Defendants' motion to dismiss with prejudice.

## I. BACKGROUND

**A. Factual Allegations**

Plaintiffs purchased or otherwise acquired Intuitive Surgical common stock between February 1, 2008, and January 7, 2009, inclusive (the "Class Period"). SAC at 1. Defendant Intuitive Surgical ("Intuitive," or the "Company") is a medical device manufacturer of cutting-edge robotic surgery devices used for certain kinds of minimally invasive surgery procedures. SAC ¶ 21. Intuitive's central product is the *da Vinci* System, which costs between $1.0 and 1.7 million. *Id.* ¶ 65. The *da Vinci* System and its accompanying surgical instruments are "Class II" medical devices, and are subject to extensive regulation by the U.S. Food and Drug Administration ("FDA"). *Id.* ¶ 56. The *da Vinci* System was introduced in the U.S. in 2000 after the FDA approved its use for "general" laparoscopic procedures. *Id.* ¶ 47. Since then, the *da Vinci* System has been approved for prostatectomy procedures (in 2001), other urological procedures (in 2005), and gynecological procedures, including hysterectomy procedures (also in 2005). *Id.* ¶ 59. Plaintiffs refer to *da Vinci* prostatectomy procedures as *dV*P procedures ("*dV*P"), and refer to *da Vinci* hysterectomy procedures as *dV*H procedures ("*dV*H").

Intuitive derives its revenue from the sale of *da Vinci* Surgical Systems ("System sales") and from recurring revenue resulting from the sale of instruments and accessories necessary to perform procedures on *da Vinci* systems ("Recurring revenue"). *Id.* ¶ 1. Plaintiffs allege that, prior to the Class Period, revenue growth was driven primarily by demand for *dV*P procedures, and only to a much lesser extent by demand for *dV*H procedures. *Id.* ¶ 2. By the beginning of the Class Period, however, *dV*P procedure growth was decelerating at a faster rate than Defendants disclosed. *Id.* ¶¶ 3-4. Plaintiffs assert that Defendants' failure to disclose this fact to investors amounted to a securities law violation.

The Individual Defendants were employed at Intuitive during the Class Period: Gong was Vice President of Finance; Cukic was Vice President of Business Development and Strategic Planning; McNamara was Executive Vice President of Worldwide Sales; Guthart was President and a Director; Mohr was Chief Financial Officer; and Smith was Chief Executive Officer and Chairman of the Board. SAC ¶¶ 22-27.

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

Plaintiffs allege that, throughout the Class Period, the Individual Defendants were repeatedly asked about the effects of the economic crisis, and "steadfastly" assured analysts and investors that "the economic crisis was not negatively impacting da Vinci placements or revenues," when in truth, the economic crisis was negatively impacting Intuitive's sales and revenues. *Id.* ¶ 9. Plaintiffs allege that the Company's key customers are hospitals, whose primary source of income was the sale of bonds, until the market for these bonds was disrupted in late January 2008, as a continuing effect of the financial crisis. *Id*. ¶¶ 134, 137, 233-34. Plaintiffs allege that the impact of this disruption on hospitals' income became apparent "to the market" in early March 2008. *Id*. ¶ 397. Moreover, by the end of 2007, unbeknownst to investors, Intuitive "had hit a penetration ceiling" as to the growth rate for some its most popular procedures. *Id.* ¶ 3. Finally, and also by the end of 2007, Intuitive Surgical had essentially saturated the market for first-time placement of the *da Vinci* System in key regions of the U.S., making further growth difficult. *Id.* ¶¶ 3-5.

To support their allegations, Plaintiffs rely on Intuitive's public filings with the U.S. Securities and Exchange Commission ("SEC"), other publicly available information such as news and financial analyst reports, and interviews with former Intuitive employees and independent contractors, identified by Plaintiffs as "Corroborating Witnesses." *See id.* ¶¶ 29-39. According to these witnesses, Intuitive had an extensive and accessible tracking system, which allowed employees, including the Individual Defendants, to access information on every procedure performed. *Id.* ¶¶ 70-71. Plaintiffs contend that "knowledge of the information contained in" the Company's systems and various Company reports "is imputed to . . . Defendants based on their access to, and use of the information," and that this raises an inference of scienter. *Id*. ¶¶ 472, 489, 505, 518, 534, 547.

Plaintiffs cite a statement from one witness that Intuitive's customers were "reporting back" that they would have trouble purchasing Intuitive's instruments. *Id.* ¶ 147. Other witnesses state that they noticed a slow-down in system placements, and that placements were decelerating by 2007. *Id.* These witnesses also state that each department of Intuitive held weekly or daily meetings to report sales. *Id.* ¶ 78. One witness, who began working at the Company in September

United States District Court
For the Northern District of California

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

2008, stated that she had direct communications with Defendant Cukic about sales performance. *Id.* ¶¶ 36, 296.

Plaintiffs allege a total of thirty-one false and/or misleading statements or omissions made either in Intuitive's 2007 Form 10-K Annual Report or during one of four "Analyst Calls" in 2008, which occurred on January 31, April 17, July 22, and October 16 of 2008, respectively. The Court has organized these statements by source. Where necessary to the Court's discussion below, the Court has provided the context for the statement at issue and indicated the challenged statement itself in bold font.

**2007 Annual Report**
**Statement A1**
"System revenue grew 58% to $324.4 million compared with $205.9 million for the year ended December 31, 2006."

**Statement A2**
"Instrument and accessories revenue grew 72% to $191.7 million for the year ended December 31, 2006."

**Statement A3**
"Recurring revenue grew 66% to $276.4 million compared with $166.8 million for the year ended December 31, 2006."

**Statement A4**
"Revenue grew 61% to $600.8 million compared with $372.7 million for the year ended December 31, 2006."

**Statement A5**
"We sold 241 *da Vinci* Surgical Systems during the year ended December 31, 2007; an increase of 42% compared with 170 for the year ended December 31, 2006."

**Statement A6**
"We experienced rapid growth during the years ended December 31, 2007 and 2006, which was driven by the continued adaptation of the *da Vinci* Surgical System for use in urological, gynecologic, cardiothoracic, and general surgeries."

**Statement A7**
"The procedures that have driven the most growth in our business recently are the *da Vinci* Prostatectomy (*d*VP) and the *da Vinci* Hysterectomy (*d*VH)."

**Statement A8**
Defendants' Smith and Mohr's signed certifications of the 2007 Annual Report, pursuant to Section 302 of the Sarbanes-Oxley Act.

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
For the Northern District of California

**Statement A9**
Defendants' Smith and Mohr's signed certifications of the 2007 Annual Report, pursuant to Section 906 of the Sarbanes-Oxley Act.

**January 31, 2008 Analyst Call**
    **Statement B1** (formerly Statement 1 in First Amended Complaint ("FAC"))
"Instrument and accessor[ies] revenues, which are specifically driven by procedures performed, are expected to grow approximately 55% over 2007."

    **Statement B2** (formerly Statement 2)
"Gynecology plays a bigger and bigger role each day.  I would also say that the uptake in **gynecology has in many instances put stress on hospitals that only have one [*da Vinci*] system**, and I think you've seen again this quarter probably being the strongest side of that, and a total of 20 systems that went to repeat customers.  So **gynecology is a big player in that**, and I think will continue to be and continue to expand."

    **Statement B3** (formerly Statement 4)
Question: "On new accounts, is it a safe assumption, as you look at the U.S. business replacements on a go-forward basis, the opportunity in the U.S. is really for existing customers? And we think we have peaked out in terms of new account generation in the U.S.?"
Answer, by Defendant Smith: "**No.  Actually there are a lot of new systems placements**…. And really the opportunity here to place systems at hospitals that don't have any is still very, very large."

    **Statement B4** (formerly Statement 5)
Question: "This has been a, the topic that has been discussed for a lot of capital equipment manufacturers, and wanted to find out if you are seeing any sort of slow-down pressure in terms of the overall credit crunch market and anything that's affecting finance?"
Answer, by Defendant Smith: "**The answer** to that **is, no.** As we've talked to you, we have about half of our sales force right now meeting to – going through their pipeline. And I had [Defendant] McNamara ask them if they've seen any delay because of the credit crunch, and the answer, no one responded with any kind of positive experience there.  **So no one has seen any deals delay because of it.**"

**April 17, 2008 Analyst Call**
    **Statement C1** (formerly part of Statement 6)
"**[W]e continue to expect *d*VP and *d*VH adoption to drive the growth in our 2008 recurring revenues**.  For 2008, **we continue to expect *d*VP procedures to grow approximately 40%** on a base of about 55,000 procedures performed in 2007."

    **Statement C2** (formerly part of Statement 6)
"Instrument and accessory revenue, which is specifically driven by procedures performed, is on track to grow 55% this year."

    **Statement C3** (formerly part of Statement 6)
"We are forecasting **system revenue to grow** 33-35% over 2007, which is up from our previous forecast of 30% growth.  We expect this growth **to come from an increase in shipments.**"

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
For the Northern District of California

**Statement C4** (formerly Statement 7)

"I think **seasonality is going to be similar, as far as we know**. It was sequentially down in Q1 this year, as it has been in previous years. **We expect Q4 to be our highest quarter.** But, that said, we think the total number is going to increase year-over-year by between 33 and 35%."

**Statement C5** (formerly Statement 8)

Question: "Anything on capital equipment spending that you're hearing from your sales reps?"

Answer, by Defendant Gong: "**No, we're not hearing anything there.** I know over the quarter we've had various questions as to whether or not there's been an impact due to credit issues. And as far as we can tell, **we haven't had any impact to our system sales.**"

**Statement C6** (formerly Statement 9)

Question: "… The anxiety over [capital] spending and hospital credit, I don't know if it is a question for [Defendant Smith] or [Defendant Mohr] but – when you look at the environment, or your conversations with hospitals or decision-makers, is there anything in the external environment that makes you incrementally more concerned as you look out over the next 12 months in the U.S. versus where you might have felt six months ago, just in that external environment?"

Answer, by Defendant Smith: "On the external side, I'll try to answer that. I don't get any – **I'm still not getting any feedback from the sales organization that there's pressure.** Some hospitals are in better shape than others. But there's always a decision within a hospital of how do they prioritize their capital investment. And I think we come up typically fairly high on that priority list…. We aren't hear[ing] anything that causes us any significant concern. I've got lots of concerns about other things we ought to be running, but **that one has not yet looked like a real issue.** So, I don't have any different news than we had; no change from last quarter, I guess, is the simple way to state it."

**July 22, 2008 Analyst Call**

**Statement D1** (formerly part of Statement 10)

*dV*P "has been growing less than our previous forecast of 40%. We now expect our *dV*P procedures to grow between 35 and 39% this year . . . ."

**Statement D2** (formerly part of Statement 10)

"**Instrument and accessory revenue is expected to grow 57% to 58% this year. This is up from our previous estimate of 55%** growth."

**Statement D3** (formerly part of Statement 10)

We are now forecasting **system revenue** to grow 38 to 40% over 2007, which is up from our previous forecast of 33-35% growth. We expect this **growth to come from an increase in unit shipments.**"

**Statement D4** (formerly Statement 11)

Question: "[Defendant Gong], you talked about sequentially being down Q3 because of seasonality, and then up in Q4 … do you think seasonality will become [] more felt and that's kind of how we should be thinking in our model?"

6

United States District Court
For the Northern District of California

Answer, by Defendant Gong: "We have had seasonality in previous third quarters in that the growth for procedures has always been lower, so we would anticipate the same kind of lower procedure growth, and it was a pretty strong quarter for system placements in Q2. **We are forecasting that Q3 system placements might be relatively flat for Q3 from Q2, and then again higher in Q4.**"

**Statement D5** (formerly Statement 12)

Question: "Maybe just give us a little color on why that, second, third, or fourth system was bought.  Was it for new procedures, [or] was it higher volume in [$dVP$]?  Any clear trend there, [Defendant Cukic]?"

Answer, by Defendant Cukic: "Well, I think the answer is probably **yes in some instance to all of those** questions…. So those procedures, **GYN procedures** specifically, if you go back to the GYN approval that we received in '05 and you sort of map this out over that period, you'll see that the addition of those procedures **has required a lot of hospitals to get third and fourth systems.**  And we see that continuing."

**Statement D6** (formerly Statement 13)

"**Well, we don't think we have [hit] a penetration ceiling**" for $dVP$ procedure growth.

**Statement D7** (formerly Statement 14)

"**Certainly not.  We have actually not seen any impact on let's say [from the] credit crunch on the buying patterns of our customers.**  We get that question often, we've had it for the past six months and the answer is still the same.  **We have not seen any impact on the buying patterns.**"

**October 16, 2008 Analyst Call**

**Statement E1** (formerly Statement 15)

"Based on our third quarter results, we are increasing our previous guidance for revenue and profits for 2008.  Starting with procedures, our $dVH$ procedures are the greatest contributor to our overall growth.  We continue to expect our $dVH$ procedures to grow approximately 150% in 2008 over 2007.  With regard to $dVP$ procedures, as [Defendant Cukic] mentioned, our growth in $dVP$ lagged behind our expectations, particularly in Europe.  We continue to see $dVP$ growth, but lower than our previous forecast.  We expect our worldwide $dVP$ growth for 2008 to be greater than 30% over 2007.  Other procedures such as nephrectomies, partial nephrectomies, cystectomies, and sacral colpepresxies are growing much faster.  And as a result, our Q3 procedures in total were in line with our expectations and we continue to expect our total procedures to grow 57-58% this year from a base of approximately 85,000 procedures performed in 2007. … **We are now forecasting our system revenues to grow 45-46% over 2007, which is up from our previous forecast of 38 to 40% growth….  In summary, we are increasing our top-line revenue forecast for 2008.  We now expect revenues to grow 49 to 50% over 2007, which is up from our previous estimate** of 45 to 47%."

**Statement E2** (formerly Statement 16)

Question: "[W]ith the economic crisis, credit environment, how do we factor – or how do you guys factor that into your fourth quarter and 2008 thinking, seeing much or any impact?"

Answer, by Defendant Smith: "You guys probably know more than we do.  Clearly it's not a positive for anyone.  **We haven't seen a significant impact yet.  And that is all I can say, is yet**…. And [Defendants Gong and Cukic] can deal with this better than I can in terms of doing leases, but I suspect that they may increase – our leasing companies still have an appetite for these devices."

**Statement E3** (formerly Statement 17)

Question: "And in terms of feedback from the sales force, and in terms of like cancellations or delays in orders, anything that's different than what you may have seen, call it three months ago, or it's always challenging?"

Answer, by Defendant McNamara: "Well, we're reservedly optimistic, **we came off a good quarter for pipeline closing and pipeline development, and the reports back from the field suggest that that's continuing.**  We're in a dynamic time, we're just going to work through it."

**Statement E4** (formerly Statement 18)

Question: "[T]he whole capital spending trends just – where do you think we are over the next 6 to 12 months, and we keep – I keep reading *The Times*, we're doing surveys and we're really getting a lot of conflicting messages.  Just again, your larger picture?"

Answer, by Defendant Smith: "Well, as I started out when I talked to Tao [Levy], **I wish we had a crystal ball.**  We don't.  I think this thing is from day-to-day…. And my point is – I understand.  I don't know if that this is a one-quarter deal or it's a two-quarter deal, or it's a year or two.  But we will come out stronger…."

Answer, by Defendant Cukic: "When you look at our value proposition, which is directed at capital expenditures, I think from a hospital standpoint and microeconomics, we sit **in a** pretty **good position**."

Answer, by Defendant Gong: "And there is something that we can probably shed some light on is historically we said about 15% of our systems have been leased [through third parties].  That has actually increased a little bit over the past couple of quarters to closer to 20%.  And according to our leasing partners it appears that the credit crunch is causing an increase in financed system purchases, because hospitals are turning to these leasing companies more since their other sources of funding have gotten a little bit tighter.  Those leasing companies, they tell us, have plenty of capacity and we get calls from them all of the time.  So … I just want to say there is certainly from our perspective availability from a leasing standpoint."

**Statement E5** (formerly Statement 19)

Question: "Okay, and in terms of CapEx [capital expenditures] spending potentially being a tougher decision for the hospitals, are you expecting longer lead times and generally more people and administration being involved in the purchase decision going forward?"

Answer, by Defendant Mohr: "**At the present time, we don't have any indicators that tell us that's the case or anything has changed.  But we're early into this.**"

Although the allegedly misleading statements are lengthy, the thrust of Plaintiffs' allegations is that Defendants misled investors about Intuitive's financial prospects knowing that the financial guidance was false and misleading when issued.

Over the course of the Class Period, Intuitive's stock price fell from $305.61 on February 1, 2008, down to $93.29 on January 23, 2009, a decline of nearly 70%. SAC ¶ 16. Plaintiffs allege that this drop in stock price resulted from the Company's disclosure, at last, of the truth regarding the deceleration in *d*VP procedure growth, the ability of other procedures to offset the deceleration in *d*VP procedure growth, the impact of the economic crisis, and the Company's ability to place new systems. *Id.* ¶¶ 14-16. Finally, Plaintiffs allege that each of the Individual Defendants "reaped significant proceeds from insider sales" based on the false and misleading statements or omissions inflating Intuitive's stock price during the Class Period. *Id.* ¶ 476.

Based on the thirty-one allegedly false and misleading statements, Plaintiffs' SAC asserts causes of action for alleged violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934.

### B.  Procedural History

Plaintiffs filed their original complaint on August 6, 2010, and filed a First Amended Complaint ("FAC") on April 15, 2011, pursuant to a stipulated agreement with Defendants. Defendants moved to dismiss the FAC, which the Court granted on August 10, 2011, with leave to amend. *See* ECF No. 56 ("Order"). Plaintiffs timely filed the operative SAC on September 12, 2011. *See* ECF No. 57. Plaintiffs re-allege 18 of their 19 original statements based on the four Analyst Calls, and also add 9 new statements from Intuitive's 2007 Annual Report. Plaintiffs also break down FAC Statements 6 and 10 into six shorter statements in the SAC. On October 13, 2011, Defendants moved to dismiss all claims raised in the SAC. ECF No. 60.

### C.  Request for Judicial Notice

In connection with their motion to dismiss, Defendants ask this Court to take judicial notice of the transcripts of five quarterly earnings calls and three reports filed with the SEC. *See* Defendants' Request for Judicial Notice, ECF No. 61 ("RJN"), Exs. A-D & F (transcripts); Exs. E, G, H (reports). "Although generally the scope of review on a motion to dismiss for failure to state a claim is limited to the Complaint, a court may consider evidence on which the complaint necessarily relies if: (1) the complaint refers to the document; (2) the document is central to the plaintiffs' claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6)

9

United States District Court
For the Northern District of California

motion." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (internal quotation marks and citations omitted).  The court may "treat such a document as 'part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir. 2006) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).

Here, Plaintiffs' SAC refers to the contents of Defendants' quarterly earnings calls that occurred on January 31, 2008; April 17, 2008; July 22, 2008; and October 16, 2008.  The SAC also references the 2007 Annual Report filed with the SEC on February 14, 2008.  *See, e.g.*, SAC ¶¶ 124, 186, 249, 311, 392.  Accordingly, judicial notice of Exhibits A through E is appropriate. However, Defendants also urge the Court to take judicial notice of Defendants' 2008 Annual Report, filed with the SEC on February 6, 2009; Defendants' Form 8-K Report filed with the SEC on December 2, 2008; and the transcript of an earnings call from July 19, 2007.  RJN, Exs. G, H, F. As these documents are neither incorporated into the SAC by reference nor necessary to the Court's resolution of this motion, the Court declines to take judicial notice of Exhibits F, G, and H at this time.

## II.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal under Rule 12(b)(6) may be based on either (1) the "lack of a cognizable legal theory," or (2) "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  In considering whether the complaint is sufficient to state a claim, the court accepts as true all of the factual allegations contained in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).  However, the court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).  While a complaint need not allege detailed factual allegations, it

10

1   "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

2   on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

3   (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference

4   that the defendant is liable for the misconduct alleged." *Id.*

5   ## B. Federal Rule of Civil Procedure 9(b) and the PSLRA

6   Because Plaintiffs have brought securities fraud claims under the PSLRA, Rule 12(b)(6) is

7   not the only governing legal standard. Plaintiffs must also satisfy the heightened pleading

8   standards set forth by Rule 9(b) of the Federal Rules of Civil Procedure and by the PSLRA itself.

9   *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Rule 9(b) of the

10  Federal Rules of Civil Procedure requires a plaintiff alleging fraud or mistake to "state with

11  particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see Nursing*

12  *Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). In addition,

13  the PSLRA requires a plaintiff alleging securities fraud to "plead with particularity both falsity and

14  scienter." *Zucco Partners*, 552 F.3d at 990-91; *accord Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

15  551 U.S. 308, 314 (2007). With respect to falsity, the complaint must "specify each statement

16  alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15

17  U.S.C. § 78u-4(b)(1). To the extent an allegation is based on information and belief, "the

18  complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

19  4(b)(1). In doing so, the plaintiff shall "reveal 'the sources of [his] information.'" *In re Daou Sys.,*

20  *Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d

21  970, 974 (9th Cir. 1999)). With respect to scienter, the complaint must "state with particularity

22  facts giving rise to a strong inference that the defendant acted with the required state of mind." 15

23  U.S.C. § 78u-4(b)(2). That is, plaintiffs must plead with particularity the facts evidencing "the

24  defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 313 (quoting

25  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)); *see also id.* at 319. To satisfy the

26  rigorous pleading standards of the PSLRA, the complaint's scienter allegations must give rise not

27  simply to a plausible inference of scienter, but rather to an inference of scienter that is "cogent and

28

1   at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at

2   314; *see also id.* at 324.

3   **III. DISCUSSION**

4         Under Section 10(b) of the Exchange Act, it is unlawful for any person to "use or employ,

5   in connection with the purchase or sale of any security . . . any manipulative or deceptive device or

6   contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C.

7   § 78j(b); *see also* 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). Rule 10b-5, which is the regulation

8   promulgated under Section 10(b), further provides that it is unlawful "[t]o make any untrue

9   statement of a material fact or to omit to state a material fact necessary in order to make the

10   statements made, in the light of the circumstances under which they were made, not misleading."

11   17 C.F.R. § 240.10b-5(b). To state a claim that Defendants made material misrepresentations or

12   omissions in violation of § 10(b) and Rule 10b-5, Plaintiffs must allege sufficient facts showing:

13   "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection

14   between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon

15   the misrepresentation or omission; (5) economic loss; and (6) loss causation." *See Matrixx*

16   *Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1317 (2011) (citing *Stoneridge Inv. Partners, LLC*

17   *v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)); *see also In re Gilead Scis.*, 536 F.3d at 1055

18   (identifying the five elements of a Rule 10b-5 claim as: "(1) a material misrepresentation or

19   omission of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4)

20   transaction and loss causation; and (5) economic loss").

21         Here, Defendants challenge only the first and second elements under § 10(b), advancing

22   four different arguments that Defendants contend collectively require dismissal of the SAC in its

23   entirety. Defendants argue that most of the challenged Statements do not constitute "a material

24   misrepresentation or omission" because they are either: (1) forward-looking statements protected

25   by the PSLRA Safe Harbor; (2) unactionable expressions of corporate optimism; or (3) not false.

26   Defendants further argue that Plaintiffs have failed to plead particularized facts giving rise to a

27

28

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

strong inference of scienter, as required by the PSLRA.  The Court addresses these arguments in

turn.[1]

### A.  Material Misrepresentation or Omission

Plaintiffs allege that Defendants made a total of thirty-one false or misleading statements

because they knew, but did not disclose, that: (1) the economic crisis was having a negative impact

on the Company; (2) Intuitive's ability to sustain system placement growth, among both new

accounts in the U.S. and to repeat purchasers, was reaching a saturation point; and (3) $d$VP growth

was decelerating at a faster rate than disclosed, impacting the Company's ability to sustain

Recurring revenue growth.  Twenty-two of the accused statements were made during the four

Analyst Calls and were previously asserted in some form in the prior complaint.  Although

Plaintiffs have sliced and repackaged these twenty-two statements differently, the allegations

remain essentially the same as the allegations in the FAC previously found deficient by the Court.

The nine new statements were made in Intuitive's 2007 Annual Report.  For the reasons discussed

below, the Court concludes that: (1) twelve of these statements are forward-looking statements

protected by the PSLRA Safe Harbor provision; (2) another four statements are expressions of

mere corporate optimism; and (3) the remaining fifteen statements are not supported by sufficient

factual allegations showing that they "affirmatively create an impression of a state of affairs that

differs in a material way from the one that actually exists."  *Brody v. Transitional Hosps. Corp.*,

280 F.3d 997, 1006 (9th Cir. 2002).

### 1.  PSLRA Safe Harbor

Under the PSLRA "Safe Harbor" Provision, "forward-looking statements" are not

actionable as a matter of law if they are identified as such and accompanied by "meaningful

cautionary statements identifying important facts that could cause actual results to differ materially

from those in the forward looking statement."  *See* 15 U.S.C. § 78u-5(c)(1)(A)(i).  A forward

looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of

---

[1] As was the case in the first motion to dismiss, Defendants have challenged some Statements on multiple grounds.  The Court will limit its analysis to the most persuasive ground for dismissal with respect to each of the challenged Statements.

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    management for future operations, (3) future economic performance, or (4) the assumptions

2    'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint Council Pension*

3    *Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u-

4    5(i)).[2] "[I]f a forward-looking statement is identified as such and accompanied by meaningful

5    cautionary statements, then the state of mind of the individual making the statement is irrelevant,

6    and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera*

7    *Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010).  Alternatively, if a forward-looking statement is

8    not identified as such or is unaccompanied by meaningful cautionary statements, then the statement

9    is actionable only if the plaintiff proves that the forward-looking statement "was made with actual

10   knowledge by that person that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B);

11   *see Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996).

12       Ten of Plaintiff's challenged statements were previously held by this Court to be

13   unactionable because they are "prototypical examples of 'forward-looking' statements" and were

14   accompanied by meaningful cautionary statements, and are thus protected by the PSLRA's Safe

15   Harbor.  *See* Order at 12-13.  The Court previously observed that these statements all concern

16   either Defendants' revenue projections or Defendants' answers to questions regarding revenue and

17   sales forecasts.  *See* 15 U.S.C. § 78u-5(i)(1) (defining "forward-looking statement"); *In re*

18   *LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1046 (N.D. Cal. 2007) (holding that

19   statements predicting the company's future expected sales or other financial results fell squarely

20   ――――――――――――――
     [2] The PSLRA defines "forward-looking statement" as:

21           (A) a statement containing a projection of revenues, income (including income
     loss), earnings (including earnings loss) per share, capital expenditures, dividends,

22   capital structure, or other financial items; (B) a statement of the plans and objectives
     of management for future operations, including plans or objectives relating to the

23   products or services of the issuer; (C) a statement of future economic performance,
     including any such statement contained in a discussion and analysis of financial

24   condition by the management or in the results of operations included pursuant to the
     rules and regulations of the Commission; (D) any statement of the assumptions

25   underlying or relating to any statement described in subparagraph (A), (B), or (C);
     (E) any report issued by an outside reviewer retained by an issuer, to the extent that

26   the report assesses a forward-looking statement made by the issuer; or (F) a
     statement containing a projection or estimate of such other items as may be

27   specified by rule or regulation of the Commission.

28   15 U.S.C. § 78u-5(i)(1).

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
For the Northern District of California

1    within the scope of the Safe Harbor provision).  The Court again finds Statements B1 (formerly

2    Statement 1), C1 through C3 (formerly Statement 6), C4 (formerly Statement 7), D1 through D3

3    (formerly Statement 10), E1 (formerly Statement 15), and E5 (formerly Statement 19) to be

4    forward-looking on their face, appropriately identified as such, and accompanied by meaningful

5    cautionary language.  In addition, the Court finds Statements C6 (formerly Statement 9) and D4

6    (formerly Statement 11) to be forward-looking statements protected by the PSLRA Safe Harbor

7    provision.

8                                  **a.   Forward-Looking**

9                Statement B1 gives the rate at which revenues "are expected to grow" over 2007.  SAC ¶

10   188.  Further, Plaintiffs take Statement B1 from a paragraph in which the word "expect" is used

11   seven times, *id*. ¶ 187, and which was introduced in the analyst call as "our 2008 financial

12   *forecast*."  RJN, Ex. A at 6 (emphasis added).  Clearly, both the plain language of Statement B1

13   and the context in which it was made demonstrate that it is a forward-looking statement identified

14   as such.  Similarly, Statements C1, C3, and C4 each begin with the language "we expect," and

15   explicitly deal with Defendants' revenue projections for the coming year. SAC ¶¶ 249, 269, 280.

16   Statement C2 states that revenue "is on track to grow 55% this year," which likewise provides

17   indication of a forward-looking projection.  *Id*. ¶ 260.  Moreover, Defendant Gong described these

18   statements as "our updated 2008 financial forecast."  RJN, Ex. B at 7.  Thus, Statements C1-C4 are

19   forward-looking statements identified as such.

20               Statements D1, D2, and D3 likewise consist of revenue projections and forecasts, such as,

21   "[w]e now expect our *dV*P procedures to grow between 35 and 39% this year," "revenue is

22   expected to grow 57% to 58% this year," and "[w]e are now forecasting system revenue to grow 38

23   to 40% over 2007, . . . up from our previous forecast."  SAC ¶¶ 312, 313, 324.  Statement D4, even

24   as quoted by Plaintiffs, begins with the phrase "[w]e are forecasting," and states that placements

25   "might be" flat. SAC ¶ 335.  This is forward-looking language.  Moreover, these statements were

26   explicitly introduced as financial forecasts.  RJN Ex. C at 7.  Statement E1 is also a financial

27   forecast and explicitly identified as such.  SAC ¶¶ 392-93; RJN Ex. D at 6-7.  Though Statement

28   E5 states that Defendants lacked indicators of longer sales lead times "[a]t the present time,"

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

**United States District Court**
For the Northern District of California

Defendant Mohr's statement, read in context, is in response to an analyst's question about "longer lead times . . . *going forward*." SAC ¶¶ 408, 417 (emphasis added). This statement was further couched with the caution that "we're early into this." *Id*. Thus, Statement E5, too, is a forward-looking statement.

Finally, Statement C6 was stated in response to an analyst asking Defendants to "look out over the next 12 months." *Id*. ¶ 290. Thus, the question to which Statement C6 responded framed the Statement as forward-looking. Additionally, while Plaintiffs improperly alter Defendant Smith's statement to read that customer cutbacks "has not looked like a real issue," the Court notes Defendant Smith actually stated, "has not *yet* looked like a real issue." *Id*. ¶¶ 292, 290 (emphasis added). Despite Plaintiffs' erroneous editing, this statement, too, is forward-looking.

**b. Cautionary Language**

Furthermore, the Court already previously determined that the challenged Statements were adequately accompanied by meaningful cautionary language and thus immunized by the Safe Harbor provision. Order at 12-13. A representative of Intuitive began all four of the Analyst Calls at issue with a notice that the opinions and statements regarding revenue guidance were forward-looking and that actual results could vary based on risks and uncertainties identified in Intuitive's filings with the SEC. *Id*. Intuitive's SEC filings detailed a number of risk factors including, for example, failure to achieve "market acceptance" by slow adoption of the *da Vinci* System, unforeseen national and global economic downturns, and inability of institutions and doctors to obtain sufficient reimbursement for use of the *da Vinci* System. *See* RJN Ex. E [Intuitive Surgical Form 10-K 2007], at 21-32.

Plaintiffs are unable to cure this deficiency, and indeed, they have not done so in their third attempt to state a claim. Instead, Plaintiffs contend that none of the above forward-looking statements are protected by the Safe Harbor provision because "either '(1) the statement was not actually believed [by the speaker], (2) there [was] no reasonable basis for the belief, or (3) the speaker [was] aware of undisclosed facts tending to seriously undermine the statement's accuracy.'" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010) (quoting *Provenz v. Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996)); *see, e.g.*, Opp'n at 13-14. Plaintiffs further argue that

16

United States District Court
For the Northern District of California

1    the supposed "cautionary language" provided at the beginning of the four Analyst Calls was not

2    "meaningful" because "Defendants knew that [] the economic crisis was already impacting

3    Intuitive," and Plaintiffs rely on *Matrixx Initiatives* for the proposition that statements made with

4    actual knowledge of falsity are not shielded, even if forward-looking and accompanied by

5    cautionary language.  Opp'n at 13-14 (citing *Matrixx Initiatives, Inc.*, 131 S. Ct. at 1324 n.14).

6         Plaintiffs misstate the law.  The relevant passage of *Matrixx Initiatives* cites 15 U.S.C. §

7    78u-5(c)(1)(B), which provides that proof of "actual knowledge" removes a forward-looking

8    statement from the Safe Harbor's protection, but the passage does not discuss § 78u-5(c)(1)(A),

9    which immunizes forward-looking statements identified as such and accompanied by adequate

10   cautionary language.  The *Matrixx Initiatives* decision does not address whether any particular

11   showing of scienter removes a forward-looking statement accompanied by adequate cautionary

12   language from the Safe Harbor's protection.  Likewise, *In re Oracle* is inapposite, as the

13   defendants in that case disclaimed invocation of the PSLRA Safe Harbor on appeal.  *See In re*

14   *Oracle*, 627 F.3d at 388 n.2.  Accordingly, in the absence of Supreme Court guidance otherwise,

15   the Court follows *In re Cutera*, which is the most recent Ninth Circuit decision discussing the

16   absence of a scienter requirement under § 78u-5(c)(1)(A).

17        Notwithstanding Plaintiffs' assertion that Defendants' cautionary language amounted to no

18   more than "generalized, 'boilerplate' warnings" and were therefore not meaningful, the warnings

19   provided here are virtually identical to those held sufficient by the Ninth Circuit in *In re Cutera*.

20   The Ninth Circuit noted that "Cutera's January 31 conference call began with a notice that 'these

21   prepared remarks contain forward-looking statements concerning future financial performance and

22   guidance,' that 'management may make additional forward-looking statements in response to[ ]

23   questions,' and that factors like Cutera's 'ability to continue increasing sales performance

24   worldwide' could cause variance in the results."  610 F.3d at 1112.  Here, Defendant Gong opened

25   the July 22, 2008 Analyst Call by saying, "Before we begin, I would like to inform you that

26   comments mentioned on today's call may be deemed to contain forward-looking statements.

27   Actual results may differ materially from those expressed or implied as a result of certain risks and

28   uncertainties.  These risks and uncertainties are described in detail in the Company's Securities and

17

Exchange Commission filings.  Respective investors are cautioned not to place undue reliance on

such forward-looking statements."  RJN Ex. C at 1; *see also id.* Exs. A, B, D (containing identical

language at the beginning of each call).  The Court again concludes that the cautionary language

used by Defendants was sufficient to insulate its forward-looking statements from liability under

the PSLRA.

In sum, Statements B1, C1, C2, C3, C4, C6, D1, D2, D3, D4, E1, and E5 are forward-

looking statements identified as such and accompanied by meaningful cautionary language.

Accordingly, these statements are protected under the Safe Harbor provision and cannot serve as

the basis for a securities fraud claim under the PSLRA.

## 2.  Expressions of Corporate Optimism

In the Ninth Circuit, "vague, generalized assertions of corporate optimism or statements of

'mere puffing' are not actionable material misrepresentations under federal securities laws"

because no reasonable investor would rely on such statements.  *In re Impac Mortg. Holdings, Inc.*,

554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008) (citing *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352

F.3d 367, 379 (9th Cir. 2003)); *see In re Cutera*, 610 F.3d at 1111 ("[P]rofessional investors, and

most amateur investors as well, know how to devalue the optimism of corporate executives.").

"When valuing corporations, . . . investors do not rely on vague statements of optimism like

'good,' 'well-regarded,' or other feel good monikers."  *In re Cutera*, 610 F.3d at 1111.  Thus, for

example, a court has held unactionable as "mere puffery" statements that "[w]e are very pleased

with the learning from our pilot launch," "so far we're getting really great feedback," and "we are

very pleased with our progress to date."  *Wozniak v. Align Tech., Inc.*, No. C 09-3671 MMC, 2012

WL 368366, at *4-5 (N.D. Cal. Feb. 3, 2012).  Likewise, "statements projecting 'excellent results,'

a 'blowout winner' product, 'significant sales gains,' and '10% to 30% growth rate over the next

several years'" have been held unactionable as mere puffery.  *In re Cornerstone Propane Partners,*

*L.P. Sec. Litig.*, 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005); *see also In re Copper Mountain Sec.*

*Litig.*, 311 F. Supp. 2d 857, 868-89 (N.D. Cal. 2004) ("run-of-the-mill" statements such as

"business remained strong" are not actionable under § 10(b)); *In re LeapFrog*, 527 F. Supp. 2d at

1050 (vague and amorphous statements such as "This is going to be a very big second half for us,"

18

"Our underlying sell-through at the retail level remained very strong throughout the third quarter," "consumer demand for our learning products is more vibrant than ever, and "We are pleased with our progress" were unactionable under § 10(b)).

The Court previously dismissed Plaintiffs' claims based on four of the challenged statements upon finding the statements to be mere expressions of corporate optimism.  *See* Order at 14.  These statements have been re-pled in the SAC as Statement B3 (formerly Statement 4), D6 (formerly Statement 13), E3 (formerly Statement 17), and E4 (formerly Statement 18).  Plaintiffs have failed to cure the deficiencies identified in the Court's previous Order, and the Court finds that these statements remain unactionable under § 10(b) as mere expressions of corporate optimism.

In Statement B3, Defendant Smith responded to a question regarding potential peak-out in U.S. sales by saying, "No.  Actually there are a lot of new systems placements . . . .  And really the opportunity here to place systems at hospitals that don't have any is still very, very large."  SAC ¶ 210.  The Court previously determined that this statement, which expresses general confidence about remaining placement opportunities, is an expression of mere corporate optimism, on which a reasonable investor would not rely.  *See* Order at 14.  Notwithstanding Plaintiffs' attempt to excise the second half of this statement and state a claim based solely on the first assertion that "there are a lot of new systems placements," the Statement, read in context, continues to address remaining placement opportunities in a vague and general way.  *See In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414-15 (9th Cir. 1994) (explaining that statements must be analyzed in context to determine if they are misleading).  Statement B3 is thus still mere corporate optimism and still unactionable.

With respect to Statement D6, Plaintiffs misquote Defendant Smith as saying "we don't think we have [hit] a penetration ceiling," and then alleging that the Statement "was false because *dV*P procedure growth had hit a penetration ceiling and would continue to decline, going forward."  SAC ¶ 355.  In reality, in response to an analyst's question about whether Intuitive thought it had hit a penetration ceiling, Defendant Smith optimistically responded, "Well, we don't think we have [sic] penetration ceiling."  RJN Ex. C at 13.  Defendant Smith's actual statement merely expresses

19

United States District Court
For the Northern District of California

1  a belief that the Company's product has no penetration ceiling, which the Court again finds to be

2  an unactionable statement of corporate optimism.

3       Next, Plaintiffs argue that Statement E3 was misleading because Defendants "knew, but

4  never disclosed . . . that the economic crisis was already" negatively affecting sales.  SAC ¶ 411.

5  Despite Plaintiffs' editing of this statement to be one of factual assertion, the Court notes that the

6  full statement made by Defendant McNamara was, "Well, we're *reservedly optimistic*, we came off

7  a good quarter for pipeline closing and pipeline development, and the reports back from the field

8  suggest that that's continuing.  We're in a dynamic time, *we're just going to work through it*."  *Id.*

9  ¶ 406 (emphases added).  The phrases "reservedly optimistic" and "suggest that that's continuing"

10  establish this statement as an expression of optimism.

11       Finally, Statement E4 is Defendants' response to a question about the Company's prospects

12  over the next six to twelve months.  Defendant Smith responded, "I wish we had a crystal ball.  We

13  don't. . . .  But we *will come out stronger*," and "we sit *in a pretty good position*."  *Id.* ¶ 407

14  (emphasis added).  At worst, one could criticize Defendants for failing to answer an analyst's

15  question, but Statement E4, like Statement B3, is rife with vague, amorphous language that cannot

16  support a § 10b claim.

17       In sum, Statements B3, D6, E3, and E4 are "mere puffery" and thus cannot support a claim

18  under the PSLRA.

19                 **3.  Not False or Misleading**

20       The remaining statements are Statements B2 (formerly Statement 2), B4 (formerly

21  Statement 5), C5 (formerly Statement 8), D5 (formerly Statement 12), D7 (formerly Statement 14),

22  and E2 (formerly Statement 16), all of which were previously held to be insufficiently pled to

23  sustain a securities violation claim, *see* Order at 15-16, as well as newly pled Statements A1

24  through A9 from the 2007 Annual Report.  Defendants move to dismiss these remaining statements

25  on the ground that they were neither false nor misleading.

26       It is well established that the PSLRA does not impose a duty of completeness.  As the

27  Supreme Court has recently reaffirmed, "§ 10(b) and Rule 10b-5(b) do not create an affirmative

28  duty to disclose any and all material information."  *Matrixx Initiatives*, 131 S. Ct. at 1321-22

20

1    (citing 17 C.F.R. § 240.10b-5(b)). Indeed, "[s]ilence, absent a duty to disclose, is not misleading

2    under Rule 10b-5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Rather, "[t]o be

3    actionable under the securities laws, an omission must be misleading." *Brody*, 280 F.3d at 1006.

4    That is to say the omission "must affirmatively create an impression of a state of affairs that differs

5    in a material way from the one that actually exists." *Id.* "[T]o fulfill the materiality requirement

6    'there must be a substantial likelihood that the disclosure of the omitted fact would have been

7    viewed by the reasonable investor as having significantly altered the "total mix" of information

8    made available.'" *Basic*, 485 U.S. at 231-32 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S.

9    438, 449 (1976)).

10        Defendants argue that Statements A1 through A9 are "accurate statements of historical

11   fact." Mot. at 20-21. Defendants further argue that the remaining statements, all having to do with

12   projected systems revenue and the number of procedures performed, are accurate "even with the

13   benefit of hindsight" and thus cannot be misleading. Mot. at 22; *see also* ECF No. 48 at 8-12.

14        Plaintiffs concede that "the Annual Report statements accurately stated Intuitive's historical

15   results," Opp'n at 22, but they nonetheless argue that the statements were rendered misleading by

16   Defendants' nondisclosure of several "then-existing known trends": (1) system placement growth

17   was declining due to the economic crisis, *see, e.g.*, SAC ¶¶ 133, 141, 143; (2) system revenue was

18   increasingly attributable to higher prices per system rather than number of systems placed, *see,*

19   *e.g.*, SAC ¶¶ 130, 140; and (3) system placement growth was declining due to market saturation

20   because additional systems were only purchased at a utilization rate of 250-300+ procedures, *see,*

21   *e.g.*, SAC ¶¶ 134, 141. Plaintiffs allege that disclosure of these trends was not only required under

22   Regulation S-K Item 303, but moreover was material to a reasonable investor's proper

23   understanding of Intuitive's financial condition, because a deceleration in *dV*P system placement

24   growth would limit the sustainability of Instrument and accessories revenue growth and Recurring

25   revenue growth, both of which are dependent on, and correlated with, the number of systems

26   placed. *See, e.g.*, SAC ¶¶ 131, 136, 141-42. Plaintiffs allege that the materiality of these omissions

27   is evidenced by the fact that Intuitive's stock price fell once the information was disclosed. SAC ¶

28   16; *see In re Cutera*, 610 F.3d at 1110 (stock fluctuation upon disclosure of omitted information

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
For the Northern District of California

tends to show materiality).  The nondisclosure of these trends also serves as the basis for Plaintiffs'

assertion that the remaining statements were misleading.

Item 303 of Regulation S-K requires that a company disclose "known trends or

uncertainties that have had or that the registrant reasonably expects will have a material favorable

or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §

229.303(a)(3)(ii).  As an initial matter, the Court notes that Item 303 requires such disclosures in a

company's annual report, but does not apply to "interim reports, to press releases, or to other

communications with shareholders."  *In re Metricom Sec. Litig.*, C 01-4085 PJH, 2004 WL

966291, at *19 (N.D. Cal. Apr. 24, 2004), *aff'd sub nom. Young v. Dreisbach*, 182 F. App'x 814

(9th Cir. 2006); *see also In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1086 (N.D. Cal. 2001)

("Regulation S–K does not govern statements contained in press releases because press releases are

not required to be filed with the SEC.") (citing 17 C.F.R. § 229.10).[3]  Thus, to the extent Plaintiffs

rely on the duty of disclosure imposed by Item 303 to support a showing of a material omission for

Statements B2, B4, C5, D5, D7, and E2, Plaintiffs must look elsewhere.  Further, "[i]t is well

established that violation of an exchange rule will not support a [Section 10(b) or Rule 10b-5]

claim."[4]  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) (citation omitted).  The Ninth

Circuit has "decline[d] to hold that a violation of exchange rules governing disclosure may be

---

[3] The Court also notes that the majority of the Analyst Calls cited by Plaintiffs discussed quarterly rather than annual earnings.  SAC ¶¶ 11, 238, 310, 383.  Interim periods are governed by section b of Item 303, which does not contain section a's requirement to disclose known trends and volume/price information.  *See* 17 C.F.R. § 229.303(b); *see also Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1118 (N.D. Cal. 2003) ("17 C.F.R. § 229.303(b), which governs interim period reporting, does not include the requirement of section 303(a) to disclose certain 'known trends,' the requirement that Plaintiffs allege in the Complaint was breached.").  Thus, Defendants were not required by Item 303 to disclose these "known trends," as identified by Plaintiffs, during these quarterly calls.

[4] After the hearing on the Motion to Dismiss, Defendants filed a Motion for Leave to File Supplemental Authority, in which it argues that Ninth Circuit authority precludes a private securities claim based on Item 303.  *See* ECF No. 70.  Plaintiffs opposed the Motion for Leave on the grounds that "Defendants have already raised the exact same arguments in previous briefing and at oral argument; and because the arguments proffered do not support dismissal of the Complaint."  *See* ECF No. 71 at 6.  Defendants filed a Reply.  ECF No.72.  Because the Court agrees with Plaintiffs that Defendants have had ample opportunity to brief this issue, and indeed Defendants made this argument in their Motion to Dismiss and at oral argument, supplemental briefing is unnecessary.  Accordingly, Defendants' Motion for Leave is DENIED.

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
For the Northern District of California

imported as a surrogate for straight materiality analysis under § 10(b) and Rule 10b-5." *Id.* Thus, even if Defendants had a duty under Item 303 to disclose these then-existing known trends in the 2007 Annual Report, their failure to do so does not, on its own, establish materiality for purposes of Plaintiffs' § 10(b) claim. Rather, Plaintiffs must independently demonstrate why these alleged nondisclosures were misleading.

Plaintiffs have failed to do so. Statements A1 through A9 correctly reported Intuitive's financial results for the prior year, as well as the surgical procedures that most contributed to Intuitive's growth. These Statements are strictly historical; none of these Statements purport to address the future sustainability of Intuitive's performance. Thus, disclosure of the disputed "known trends" would not have caused these Statements to convey a different meaning than what they conveyed on their face to investors.

Finally, to the extent Statements B2, B4, C5, D5, D7, and E2 do not contain forward-looking statements or mere expressions of corporate optimism, the Court's determination of whether they were false or misleading is intricately tied to the question of whether Plaintiffs have adequately pled that Defendants knew these statements to be false. Courts may analyze falsity and scienter together, even though they are separate elements, because they generally depend upon the same set of facts. *See In re Daou*, 411 F.3d at 1015. For example, Statement B4 is a response to an analyst's question about whether the Company was seeing any slow-down from the overall credit crunch, to which Defendant Smith responded, "no. . . . no one has seen any deals delay because of [the credit crunch]." The Court agrees with Plaintiffs that this statement could be downright false if the truth was that the Company knew it was already being negatively impacted by the credit crunch at the time Defendant Smith made this statement. However, for the reasons discussed below, Plaintiffs have failed to plead a strong inference of scienter as to the falsity of this or any other Statement, and thus B4, too, is unactionable. Statements B2, C5, D5, D7, and E2 fall victim to the same defect, as discussed below.

In sum, Plaintiffs have failed to show the alleged omissions "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. Consequently, Statements A1 through A9, B2, B4, C5, D5, D7, and E2

23

**United States District Court**
For the Northern District of California

1  cannot support a § 10(b) claim.  Plaintiffs have therefore failed to plead with particularity any

2  material misrepresentation or omission that would support a securities fraud claim under the

3  PSLRA, and Defendants' motion to dismiss for failure to state a claim is therefore GRANTED on

4  this ground.

5      **B.  Scienter**

6      In addition to dismissing the FAC for failure to allege a misrepresentation or omission of

7  material fact, the Court previously found lacking Plaintiffs' allegations of scienter, and accordingly

8  instructed Plaintiffs in any amended complaint to "either: (1) point to a dramatically false statement

9  that itself creates a strong inference of deliberate recklessness or actual knowledge of falsity; or (2)

10  provide particularized allegations of scienter with respect to each corporate officer Defendant."

11  Order at 17.  In their SAC, Plaintiffs have now switched course and no longer plead "collective

12  scienter," proceeding instead primarily under a "core operations" theory.  Defendants argue that,

13  irrespective of Plaintiffs' new scienter theory, the SAC again fails to raise a strong inference of

14  scienter or to provide particularized allegations of scienter with respect to each individual

15  Defendant.  For the reasons discussed below, the Court agrees with Defendants, and accordingly

16  also dismisses the SAC in its entirety for failure to plead scienter with particularity.

17      To state a claim for securities fraud under the PSLRA, a complaint must "state with

18  particularity facts giving rise to a strong inference that the defendant acted with the required state

19  of mind."  15 U.S.C. § 78u-4(b)(2).  "The required state of mind is one of 'deliberate

20  recklessness.'"  *Nursing Home Pension Fund*, 380 F.3d at 1230 (quoting *In re Silicon Graphics*,

21  183 F.3d at 975); *see Matrixx Initiatives*, 131 S. Ct. at 1323-24 (assuming, without deciding, the

22  correctness of the Ninth Circuit's holding that "deliberate recklessness" is sufficient to establish

23  scienter).  That is to say, although actual knowledge or intent to defraud is not required, allegations

24  of reckless conduct must "'reflect[] some degree of intentional or conscious misconduct.'"  *South*

25  *Ferry LP, #2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008) (quoting *In re Silicon Graphics*, 183

26  F.3d 977).  To be "strong," "[t]he inference of scienter must be more than merely 'reasonable' or

27  'permissible' – it must be cogent and compelling, thus strong in light of other explanations."

28  *Tellabs*, 551 U.S. at 325.  A complaint will survive "only if a reasonable person would deem the

24

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    inference of scienter cogent and at least as compelling as any opposing inference one could draw

2    from the facts alleged."  *Id.* at 324; *accord Matrixx Initiatives*, 131 S. Ct. at 1324.

3    Plaintiffs' allegations of scienter are based on: (1) a "core operations" theory; (2) multiple

4    witness accounts; and (3) evidence of financial gain.  In evaluating the sufficiency of Plaintiffs'

5    allegations, the Court first determines "whether any of the plaintiff's allegations, standing alone,

6    are sufficient to create a strong inference of scienter."  *Zucco Partners*, 552 F.3d at 992.  "[I]f no

7    individual allegations are sufficient, [the Court] will conduct a 'holistic' review of the same

8    allegations," *id.*, viewing the totality of the circumstances pled, and consider whether they create an

9    inference of scienter "at least as compelling as an alternative innocent explanation," *id.* at 1006.

10   *See Tellabs*, 551 U.S. at 325 ("When evaluating the strength of an inference, "the court's job is not

11   to scrutinize each allegation in isolation but to assess all the allegations holistically.").

### 1. Core Operations

13   Plaintiffs urge this Court to infer scienter under a "core operations" theory, which imputes

14   to a company's key officers knowledge of "facts critical to a business's 'core operations' or an

15   important transaction."  *South Ferry*, 542 F.3d at 783.  Plaintiffs allege that "selling *da Vinci*

16   Surgical Systems and instruments and accessories is the core operation of Intuitive Surgical," and

17   that "[a]s required by [FDA] regulation, the Company records each use of the *da Vinci* system."

18   SAC ¶¶ 466-68, 56.  Plaintiffs allege that each *da Vinci* Surgical System and *EndoWrist* instrument

19   contains a microchip that records and tracks each use, including the number of procedures.  *Id.* ¶¶

20   70, 468.  This data is collected, maintained, and accessible to Corporate executives at all times

21   through on-line access to the Company's proprietary software systems, the "Clarify IT" system and

22   its SAP enterprise resource planning system.  *Id.* ¶¶ 70-73, 468.  Plaintiffs further allege that the

23   Company's software tracked all aspects of the Company's business "in real-time" and generated

24   various reports on the Company's business operations and business goals, including Inventory

25   Sheet reports showing each instrument purchased by each hospital, and procurement forecasts

26   detailing the materials needed to produce purchased systems.  *Id.* ¶ 469.  Because this real-time

27   data and these various reports were accessible to the Individual Defendants at all times, Plaintiffs

28   assert that knowledge of: (1) the impact of the economic crisis, (2) the market saturation because

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
For the Northern District of California

1  additional systems were being purchased at a utilization rate of 250-300+ procedures, and (3) the

2  proportion of revenue attributable to increased prices rather than placements, can all be attributed

3  to each Individual Defendant.

4          The Ninth Circuit has explained that allegations regarding management's role in a company

5  may contribute to a strong inference of scienter in three circumstances.  "First, the allegations may

6  be used in any form along with other allegations that, when read together, raise an inference of

7  scienter that is 'cogent and compelling, thus strong in light of other explanations.'"  *South Ferry*,

8  542 F.3d at 785 (quoting *Tellabs*, 551 U.S. at 324).  "Second, such allegations may independently

9  satisfy the PSLRA where they are particular and suggest that defendants had actual access to the

10 disputed information."  *Id.* at 786.  "Finally, such allegations may conceivably satisfy the PSLRA

11 standard in a more bare form, without accompanying particularized allegations, in rare

12 circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd'

13 to suggest that management was without knowledge of the matter."  *Id.* (quoting *Berson v. Applied

14 Signal Tech., Inc.*, 527 F.3d 982, 988 (9th Cir. 2008)); *see also id.* at 785 & n.3 (noting that bare

15 reliance on a core operations theory, without more, is viable only in "unusual circumstances").

16         Defendants correctly argue that a "core operations theory, standing alone, cannot satisfy the

17 PSLRA's scienter requirement" under the circumstances alleged here.  Reply at 2.  This is not the

18 "exceedingly rare" case in which a securities fraud plaintiff may rely solely on the core operations

19 inference without particularized allegations about each defendant's access to the relevant

20 information.  *See South Ferry*, 542 F.3d at 785 n.3 (discussing *Berson*, 527 F.3d at 983-88).  In

21 *Berson*, plaintiffs alleged that the defendants failed to disclose "stop-work orders" from two of its

22 largest customers, who together made up 80% of the company's revenue.  *See* 527 F.3d at 983,

23 987.  Due to the disastrous impact on the company of losing even one contract with one of these

24 customers, the Ninth Circuit found a strong inference of scienter based on the core operations

25 inference alone.  The generalized allegations here that Defendants failed to disclose known trends

26 about the economic impact of the recession or system placement deceleration come nowhere close

27 to the rare and unusual circumstances of *Berson*.

28

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
For the Northern District of California

1        Under the second category of cases where the core operations theory is applicable,

2   "[a]llegations regarding management's role in a corporate structure and the importance of the

3   corporate information about which management made false or misleading statements may also

4   create a strong inference of scienter when made in conjunction with detailed and specific

5   allegations about management's exposure to factual information within the company." *South*

6   *Ferry*, 542 F.3d at 785.  For example, in *In re Daou*, plaintiffs relied in part on "specific

7   admissions from top executives that they are involved in every detail of the company and that they

8   monitored portions of the company's database" to support a strong inference of scienter.  411 F.3d

9   at 1022-23.  Similarly, in *Nursing Home Pension Fund*, the plaintiffs alleged far more than the

10  mere general fact that defendant Oracle maintained an internal database covering global

11  information about sales of Oracle products and services.  Rather, plaintiffs there alleged "hard

12  numbers" and "specific allegations regarding large portions of [defendant] Oracle's sales data."

13  380 F.3d at 1231.  Plaintiffs quoted the CEO of the defendant company as saying, "All of our

14  information is on one database.  We know exactly how much we have sold in the last hour around

15  the world," and as admitting that he was personally involved in many of the lost or delayed deals

16  that were alleged to account for a considerable portion of the earnings shortfall during the class

17  period.  *Id.* at 1231-32.

18        Unlike in *In re Daou* and *Nursing Home Pension Fund*, the allegations of scienter here are

19  more comparable to the allegations of scienter found insufficient in *Lipton v. Pathogenesis Corp.*,

20  284 F.3d 1027 (9th Cir. 2002).  In *Lipton*, plaintiffs alleged merely that defendant corporation

21  "could regularly track its sales data" and that the company "tracked patient demand using data

22  provided by IMS [Health, an information vendor, which] indicated that patient demand was flat."

23  *Id.* at 1035-36.  The Ninth Circuit held that such allegations were "insufficient to plead scienter

24  under the PSLRA because, although 'plaintiffs refer[red] to the existence of the IMS data and

25  ma[d]e a general assertion about what they think the data show[ed],' they had no hard numbers or

26  other specific information." *Nursing Home Pension Fund*, 380 F.3d at 1231 (quoting *Lipton*, 284

27  F.3d at 1036).

28

27

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

**United States District Court**
For the Northern District of California

Here, as in *Lipton*, Plaintiffs have failed to "plead, in any detail, the contents of any such [internal sales] report or the purported data." *Lipton*, 284 F.3d at 1036. Plaintiffs essentially allege that Intuitive had a sophisticated computer system that tracked the company's sales, product usage, and other data, and that this data was available to each Defendant. But the SAC "does not contain additional detailed allegations about the defendants' actual exposure to information." *South Ferry*, 542 F.3d at 784. "[A] 'proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability.'" *Lipton*, 284 F.3d at 1036 (quoting *In re Silicon Graphics*, 183 F.3d at 985). Plaintiffs' failure to include any specific internal tracking data, let alone particularized allegations about each Defendants' access to this data, is fatal to their core operations theory. Without "some additional allegation of specific information conveyed to management" relating to the alleged misrepresentations by Defendants, "corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter." *South Ferry*, 542 F.3d at 784-85 (quoting *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 534 F.3d 1068, 1087 (9th Cir. 2008)). The 'particularity' requirement of the PSLRA cannot be satisfied by a mere conclusory assertion that Defendants had "access to, and use of the information" collected by the Company's tracking software. SAC ¶ 472. Rather, particularity requires pleading the who, what, where, when, and how regarding each Defendant's access to the relevant information that belies fraudulent intent. *See In re Copper Mountain*, 311 F. Supp. 2d at 871 (discussing *In re Silicon Graphics*, 183 F.3d at 979). In the absence of such particularized allegations, "'[the Court] cannot ascertain whether there is any basis for the allegations that the officers had actual or constructive knowledge'" of decelerating *dV*P growth placement that would cause their statements or omissions about such information to be deliberately reckless or consciously misleading. *Lipton*, 284 F.3d at 1036 (quoting *In re Silicon Graphics*, 183 F.3d at 985).

### 2. Witness Accounts

Because Plaintiffs have not shown that they can rely on a core operations theory alone to support a strong inference of scienter, the Court considers whether Plaintiffs' core operations allegations, when read together with additional allegations of witness accounts and Individual

28

United States District Court
For the Northern District of California

1    Defendants' financial gain, raises the requisite inference of scienter that is "cogent and compelling,

2    thus strong in light of other explanations." *Tellabs*, 551 U.S. at 324.  The Court first considers

3    Plaintiffs' allegations of witness accounts.

4           Plaintiffs rely on three witnesses—Todd Pace, a Clinical Sales Representative at Intuitive

5    from August 2006 through October 2008 in Florida; Sam Sudarsanam, a Program Manager at

6    Intuitive from 2006 until 2010; and Shanika Johnson, a Service Contract Specialist at Intuitive

7    from November 2004 through February 2010, SAC ¶¶ 38, 34, 39—who "attest that by the

8    beginning of the Class Period, and prior to the Statements and omissions of material fact by

9    [Defendants], the people at the Company were aware that the economic crisis was already having

10   an impact on system placements."  SAC ¶¶ 461, 483, 499, 512, 528, 542.  According to the SAC,

11   "Mr. Pace, a Clinical Sales Representative, attests that it was '100% [sic] that hospitals were

12   cutting back' due to the economic crisis, and that hospitals were reporting back to the Company

13   that they didn't have $2 million to buy a *da Vinci* system and its instruments."  *Id.*  Mr. Pace

14   reported this feedback to his supervisors during weekly meetings, and this information was then

15   incorporated into the Company's detailed sales pipeline.  Mr. Sudarsanam, who provided training

16   for new system owners, "attests that the Company began to experience decelerating placements in

17   2007 due to the economic turmoil, and that the deceleration continued throughout the Class Period

18   as the economic crisis worsened."  *Id.*  Finally, Ms. Johnson, who was responsible for tracking new

19   system installations, "attests that she noticed a slow-down in system placements due to the

20   economy."  *Id.*

21          Plaintiffs allege that these witnesses' observations about the effect of the economic crisis on

22   system placements can be imputed to the Individual Defendants because, according to six different

23   witnesses, "each department at Intuitive Surgical held weekly or daily meetings to assess

24   performance in comparison to goals and projections set by the Company's executives," and "the

25   numbers reported during the weekly meetings were 'rolled all the way to the top' to Intuitive

26   Surgical executives, including Defendants Smith and McNamara (who oversaw the sales force)."

27   *Id.* ¶ 463; *see also id.* ¶ 462.  Monika March, a Clinical Sales Representative for Intuitive from

28   September 2008 through May 2009 in Chicago, Illinois, attests that the Company held weekly and

29

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

1   quarterly meetings that were at least periodically attended by Defendants Smith and McNamara,

2   during which each Clinical Sales Representative would report on their performance.  *Id.* ¶ 464.

3   Ms. March further attests that "she spoke directly with Defendant Cukic, who reported to

4   Defendant Smith about sales performance, including the number of systems sold, during the Class

5   Period."  *Id.* ¶ 464.  The other witnesses on which Plaintiffs' scienter allegations rely are Alain

6   Adam, a Clinical Sales Manager at Intuitive in 2008 and several months in 2009 working in

7   Illinois, Wisconsin, and Indiana; Anthony Bartice, a Surgical Systems Technician at the

8   Company's manufacturing facility in Sunnyvale, California, from December 2007 through May

9   2008; and Dennis Folliott, who worked in the Shipping and Receiving department of Intuitive for

10  four months in early 2009.  *Id.* ¶¶ 463, 35, 37, 33.

11          Although Plaintiffs have produced a number of different witnesses, Plaintiffs evidently

12  must rely on stringing together these various witnesses' statements in order to impute knowledge of

13  the relevant sales data to the Individual Defendants.  Such attenuated inferences are insufficient to

14  create the requisite "cogent," "compelling," and "strong" inference of scienter required under the

15  PSLRA.  As an initial matter, several of the witnesses, such as Ms. March, Mr. Adam, and Mr.

16  Folliott, were not employed at Intuitive during the entire Class Period (or not at all during the Class

17  Period, as in the case of Mr. Folliott), and thus their statements are entitled to little weight.  *See*

18  *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009).  Moreover, Ms. March is the

19  only witness who purportedly had any direct communication with any of the Defendants, but she

20  did not begin working for Intuitive until September 2008, and thus her conversation with

21  Defendant Cukic could only be relevant to statements made during the October 16, 2008 Analyst

22  Call.  All of the accused statements from the October 16, 2008 Analyst Call have already been

23  dismissed as forward-looking or mere expressions of corporate optimism.  None of the other

24  witnesses offer anything close to an attestation that they actually communicated with any of the

25  Individual Defendants, let alone when any such communication occurred or what the contents of

26  such communications were.  In short, the witness accounts offer little, if any, reliable basis from

27  which to infer scienter.

28

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

The SAC attempts to overcome the weakness of these witness accounts by pointing to some Individual Defendants' alleged admissions that they "actively sought and tracked information regarding system placements and Recurring revenue from system placements, including Instrument and accessories revenue, through several types of detailed reports that were accessible and delivered to each Individual Defendant, including Defendants Smith and Mohr." SAC ¶ 146. Specifically, Plaintiffs allege that "during the January 31, 2008 Analyst Call, Defendant Smith admitted that he, through Defendant McNamara (who oversaw the Company's sales force), actively sought and received information from the sales force regarding the effects of the economic crisis and credit crunch on system placements." *Id.* ¶¶ 460, 487, 503. Plaintiffs further allege that "Defendant McNamara vetted the detailed sales pipeline with the sales force." *Id.* ¶ 460. While the Court agrees with Plaintiffs that Defendant Smith's admission regarding his own and Defendant McNamara's communication with the sales force would give rise to a strong inference of scienter had Plaintiffs provided reliable witness accounts of what such communication entailed, as discussed above, those necessary allegations are lacking. Thus, Defendant Smith's admission, even if accepted as such, does not support an inference that he and Defendant McNamara knew at any particular time that the economic crisis and credit crunch were adversely impacting system placements.

Plaintiffs also allege that Defendant Cukic "acknowledged . . . during the July 22, 2008 Analyst Call, [that] Intuitive Surgical 'mapped out' procedure demand expectations, and then continually compared actual procedure growth to those expectations." *Id.* ¶¶ 172, 192, 203, 255, 264, 284, 317, 339, 348, 360, 467, 486, 502, 515. Defendant Cukic's actual statement was, "if you go back to the GYN approval that we received in '05 and you *sort of map this out over that period*, you'll see that the addition of those procedures has required a lot of hospitals to get third and fourth systems." *Id.* ¶ 344 (emphasis added). Defendant Cukic did not state that Intuitive regularly maps out procedure demand expectations. Instead, he stated that if an interested party were to map out demand in 2005, then that interested party would see hospitals getting third and fourth systems. This does not indicate that Defendant Cukic "made use of" a procedure map, as claimed by

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
For the Northern District of California

Plaintiffs. *Id.* ¶ 360.  Plaintiffs' allegations as to Defendant Cukic are thus insufficient to establish scienter.

Finally, Plaintiffs also allege that "Defendant Gong acknowledged after the Class Period that each year, Intuitive Surgical's top executives go through the Company's 'bottoms-up' forecast and detailed sales pipeline to forecast the number of system placements expected over the course of the year." *Id.* ¶ 460.  Again, Plaintiffs distort Defendant Gong's actual statement, made on January 22, 2009, which was, "Well, we go through our bottoms-up forecast in a similar manner every year.  And we do take a look at that pipeline and we came up with our forecast for around flat systems for the next year, it was in light of what we saw in that pipeline." *Id.* ¶ 447.  While this statement suggests that Defendant Gong at the very least looks at the sales pipeline in making forecasts each year, Plaintiffs do not indicate the time of year in which Defendants make their annual forecasts.  Even if Defendants regularly check the pipeline before making their annual forecasts, Plaintiffs do not provide the Court with enough information to conclude that this pipeline-check occurred early enough to make the challenged statements misleading.

The Court concludes that Plaintiffs' allegations, regardless of whether they are viewed individually or in combination, do not rise to the level of "specific allegations that defendants actually did monitor the data" or "specific and detailed statement[s] about defendants' actual knowledge." *South Ferry*, 542 F.3d at 785.  Accordingly, the witness accounts and alleged admissions of Individual Defendants do not support a strong inference of scienter.

### 3. Financial Motives

Finally, Plaintiffs allege that a strong inference of scienter is created by the personal financial gain of the Individual Defendants during the Class Period.  First, Plaintiffs allege that suspiciously timed stock sales by the various Individual Defendants during the Class Period give rise to a strong inference of scienter.  SAC ¶ 476.  Specifically, Plaintiffs allege that Defendant Smith reaped proceeds of over $9 million from insider sales made over the course of the Class Period; Defendant Guthart reaped proceeds of over $6 million; Defendant McNamara reaped proceeds of over $5 million; and Defendant Mohr reaped proceeds of over $1.8 million. *Id.* ¶¶ 476, 493, 522, 551.

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

1    The Ninth Circuit has instructed that "a strong inference of fraudulent intent may arise

2    when an insider 'owning much of a company's stock make[s] rosy characterizations of company

3    performance to the market while simultaneously' selling large percentages of his holdings."

4    *Lipton*, 284 F.3d at 1036-37 (quoting *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001)).

5    Generally, however, insider stock sales are suspicious "only when the level of trading is

6    dramatically out of line with prior trading practices at times calculated to maximize the personal

7    benefit from undisclosed inside information." *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092

8    (9th Cir. 2002), *abrogated on other grounds by Tellabs*, 551 U.S. 308, *as recognized in South*

9    *Ferry*, 542 F.3d at 784; *see also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir.

10   1989) ("Large sales of stock *before* the class period are inconsistent with plaintiffs' theory that

11   defendants attempted to drive up the price of Apple stock *during* the class period.").  "To evaluate

12   suspiciousness of stock sales, [the Court] consider[s], *inter alia*, three factors: (1) the amount and

13   percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history."

14   *Nursing Home Pension Fund*, 380 F.3d at 1232 (quoting *In re Silicon Graphics*, 183 F.3d at 986).

15   Here, Plaintiffs' allegations provide no context whatsoever by which to assess whether

16   Defendants Smith, Guthart, Mohr, and McNamara's stock sales are suspicious.  Under Ninth

17   Circuit law, the absolute value of the stock sale does not on its own give rise to an inference of

18   scienter.  *See In re Vantive*, 283 F.3d at 1092 ("[B]y themselves, large numbers do not necessarily

19   create a strong inference of fraud.").  Rather, inside trading becomes suspicious only when

20   considered in comparison to the defendant's overall portfolio and trading practices.  For example,

21   in *Lipton*, the sheer fact that the defendant had sold 10,000 shares of common stock—even though

22   he had never before sold *any* shares—did "not support any inference of impropriety or fraud"

23   because 10,000 shares constituted only 1.4% of the defendant's total holdings.  284 F.3d at 1037;

24   *see also Ronconi*, 253 F.3d at 435 (suggesting that sales of 10% and 17% of an individual's

25   holdings were not suspicious); *In re Silicon Graphics*, 183 F.3d at 986-87 (transactions of four of

26   six corporate officers who each sold less than 8% of their total holdings were not suspicious).

27   Meanwhile, in *Nursing Home Pension Fund*, the Ninth Circuit found particularly relevant the fact

28   that Oracle's CEO Lawrence Ellison sold nearly $900 million worth of company stock during the

United States District Court
For the Northern District of California

1  class period after having sold no stock in five years.  380 F.3d at 1232.  Although the $900 million

2  worth of stock represented only 2.1% of the CEO's holdings, the Ninth Circuit held that "where . . .

3  stock sales result in a truly astronomical figure, less weight should be given to the fact that they

4  may represent a small portion of the defendant's holdings."  *Id.*

5      Although Defendants Smith, Guthart, Mohr, and McNamara appear to have profited richly

6  from their stock sales during the Class Period, the Court is unable to determine what percentage of

7  these Defendants' total stock holdings were sold or whether these sales deviated from Defendants'

8  stock sale patterns before and after the Class Period.  Furthermore, that Plaintiffs have *not* alleged

9  that Defendants Cukic or Gong profited from any stock sales during the Class Period weakens the

10 inference that the other Defendants' stock sales were motivated by nefarious intent to defraud the

11 market.  In the absence of more detailed allegations, Plaintiffs' allegations of insider stock sales are

12 insufficient to support a strong inference of scienter.

13      Second, Plaintiffs argue that the unusually high compensation packages for Defendants

14 support an inference of scienter because they included stock options and incentive payment

15 programs tied to Intuitive's performance.  According to the SAC, during the Class Period,

16 Defendants Smith, Mohr, Guthart, and McNamara "received substantially more in total

17 compensation for 'all services' and 'in all capacities,' including incentive-based compensation and

18 stock options, than in previous years or in future years."  SAC ¶ 473.  Specifically, Defendant

19 Smith received an increase of over 133% from the previous years; Defendant Mohr received an

20 increase of over 192% from previous years; Defendant Guthart received an increase of over 248%

21 from previous years; and Defendant McNamara received an increase of over 187% from previous

22 years.  *Id.* ¶¶ 473, 490, 519, 548.  In addition to the increased compensation of these four officers,

23 Plaintiffs allege that "Defendant Smith led the Board of Directors to approve and adopt a

24 Severance Plan" near the end of the Class Period, benefitting all Individual Defendants.  *Id.* ¶ 474.

25      The Supreme Court has recognized that "motive can be a relevant consideration, and

26 personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at

27 325.  The Court agrees that the notable spike in compensation packages for four of the Individual

28 Defendants during the Class Period is suspicious.  Nonetheless, the sheer fact that Defendants had

34

1     performance-based compensation packages does not support an inference of scienter, for "[i]f

2     simple allegations of pecuniary motive were enough to establish scienter, 'virtually every company

3     in the United States that experiences a downturn in stock price could be forced to defend securities

4     fraud actions.'" *Zucco Partners*, 552 F.3d at 1005 (quoting *Lipton*, 284 F.3d at 1038) (internal

5     citation omitted).  Here, the SAC fails to allege how the unusually high compensation packages for

6     Defendants Smith, Mohr, Guthart, and McNamara betray fraudulent intent.  Without more

7     particularized allegations connecting the two, these bare averments fail to support a strong

8     inference of scienter for the Individual Defendants.

9               **4.   Plaintiffs' Scienter Allegations as a Whole**

10          In assessing whether Plaintiffs have sufficiently pled scienter, the Court must consider

11   "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to

12   create a strong inference that defendants acted with deliberate or conscious recklessness."  *No. 84*

13   *Employer-Teamster Joint Council*, 320 F.3d at 938.  When reviewing the totality of plaintiffs'

14   allegations, "[g]eneral allegations of defendants' 'hands-on' management style, their interaction

15   with other officers and employees, their attendance at meetings, and their receipt of unspecified

16   weekly or monthly reports are insufficient."  *In re Daou*, 411 F.3d at 1022 (citing *In re Vantive*,

17   283 F.3d at 1087).  On the other hand, "specific admissions from top executives that they are

18   involved in every detail of the company and that they monitored portions of the company's

19   database are factors in favor of inferring scienter in light of improper accounting reports."  *Id.*

20   (citing *Nursing Home Pension Fund*, 380 F.3d at 1234).

21          As previously discussed, Plaintiffs' theories of scienter independently fall far short of

22   creating the requisite strong inference.  Even when viewed collectively, Plaintiffs' allegations do

23   not create a strong inference that either the Company or the Individual Defendants acted with

24   deliberate recklessness or engaged in conscious misconduct.  Accordingly, not only have Plaintiffs

25   failed to plead a material misrepresentation or omission, but they have also failed to plead the

26   necessary facts supporting a strong inference of scienter.  The Court therefore GRANTS

27   Defendants' motion to dismiss the SAC.

28                **C.  Section 20(a) of the Exchange Act**

*United States District Court*
*For the Northern District of California*

35

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

To prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law;" and (2) "that the defendant exercised actual power or control over the primary violator." *See Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Because Plaintiffs have failed to plead a primary securities law violation, Plaintiffs have also failed to plead a violation of Section 20(a). *See In re Cutera*, 610 F.3d at 1113 n.6. Accordingly, Defendants' motion to dismiss the Section 20(a) claim is also GRANTED.

### D. Leave to Amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure instructs court to "freely give leave [to amend] when justice so requires." Nonetheless, a district court may in its discretion deny leave to amend "due to 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment.'" *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "[W]here the plaintiff has previously been granted leave to amend and has subsequently failed to add the requisite particularity to its claims, '[t]he district court's discretion to deny leave to amend is particularly broad.'" *Zucco Partners*, 552 F.3d at 1007 (quoting *In re Read-Rite Corp.*, 335 F.3d 843, 845 (9th Cir. 2003)).

Here, Plaintiffs have already been given leave to amend once before to cure the deficiencies identified by the Court.[5] Although the Court dismissed Plaintiffs' First Amended Complaint for failure to adequately allege a misrepresentation or omission of a material fact, the Court observed that Plaintiffs had "failed to allege any such dramatically false statement that would merit the inference of scienter without particularized allegations as to the individual corporate officer Defendants." Order at 17. The Court further put Plaintiffs on notice that "in order to overcome a motion to dismiss with respect to any amended complaint, Plaintiff must either: (1) point to a dramatically false statement that itself creates a strong inference of deliberate recklessness or actual knowledge of falsity; or (2) provide particularize[d] allegations of scienter with respect to each

---

[5] Plaintiffs amended their initial complaint once as a matter of course, and filed their First Amended Complaint within the time stipulated to by Defendants. *See* ECF No. 45, 47.

corporate officer Defendant."  Order at 17.  "The fact that [Plaintiffs] failed to correct these

deficiencies in [their] Second Amended Complaint is 'a strong indication that the [P]laintiffs have

no additional facts to plead.'"  *Zucco Partners*, 552 F.3d at 1007 (quoting *In re Vantive*, 283 F.3d

at 1098).  Accordingly, Plaintiffs' SAC is dismissed with prejudice.

### IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the SAC is GRANTED with

prejudice.  The Clerk shall close the file.

**IT IS SO ORDERED.**


Dated: May 22, 2012

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No.: 10-CV-03451-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

United States District Court
For the Northern District of California